125 T.C. No. 8

UNITED STATES TAX COURT

TRIBUNE COMPANY, AS AGENT OF AND SUCCESSOR BY MERGER TO THE
FORMER THE TIMES MIRROR COMPANY, ITSELF AND ITS CONSOLIDATED
SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17443-02.          Filed September 27, 2005.

In 1998, Times Mirror's investment subsidiary,
TMD, divested itself of a legal publishing business
through the Bender transaction.  The transaction was
intended and designed to qualify as a tax-free
reorganization under sec. 368, I.R.C.  R determined
that the transaction was a taxable sale by TMD to Reed.
<u>Held</u>:  The primary consideration received in the
transaction was control over $1.375 billion paid by
Reed.  <u>Held</u>, <u>further</u>, the Bender transaction did not
qualify as a tax-free reorganization because the terms
and provisions of the contractual documents, as
interpreted and implemented by Times Mirror and Reed,
effected a sale.

- 2 -

Joel V. Williamson, Roger J. Jones, Gary S. Colton, Jr.,
Jeffrey Allan Goldman, Matthew C. Houchens, Daniel A. Dumezich,
Patricia Anne Yurchak, Andrew R. Roberson, Thomas Lee Kittle-
Kamp, Nathaniel Carden, and Monica Susana Melgarejo, for
petitioner.

Alan Summers, Cathy A. Goodson, William A. McCarthy,
Usha Ravi, Robert H. Schorman, Jr., Gretchen A. Kindel, and M.
Kendall Williams, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 5

Background . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A. Times Mirror . . . . . . . . . . . . . . . . . . . . . 5
    B. Changes in the Legal Publishing Landscape . . . . . . 6

Events Leading Up to the Bender Transaction . . . . . . . . . 7
    A. November 7, 1997, GS Presentation . . . . . . . . . . 7
    B. November 17, 1997, Special Meeting of Times Mirror's
       Board of Directors . . . . . . . . . . . . . . . . . 8
    C. Times Mirror's Announcement Sparks Interest by Reed
       and Wolters Kluwer . . . . . . . . . . . . . . . . . 10
    D. February 5, 1998, Regular Meeting of Times Mirror's
       Board of Directors . . . . . . . . . . . . . . . . . 11
    E. March 5, 1998, Regular Meeting of Times Mirror's
       Board of Directors . . . . . . . . . . . . . . . . . 14
    F. Reed and Wolters Kluwer Call Off Merger . . . . . . 15
    G. Melone, Sigler, and Walker Gain Access to the
       "Domestic Sandwich" Structure . . . . . . . . . . . 15
    H. Reed and Wolters Kluwer Submit Preliminary Interest
       Letters to Times Mirror . . . . . . . . . . . . . . 16
    I. The Corporate Joint Venture Structure Is Tabbed as
       the Structure of Choice for the Bender
       Transaction . . . . . . . . . . . . . . . . . . . . 17
    J. April 14, 1998, Regular Meeting of Reed's Board of
       Directors . . . . . . . . . . . . . . . . . . . . . 18
    K. Wolters Kluwer and Reed Attend Times Mirror's
       Presentations Regarding Bender . . . . . . . . . . 18

L.  Wolters Kluwer and Reed Submit Offers to Times
    Mirror  . . . . . . . . . . . . . . . . . . . . . . .  22
M.  Times Mirror Responds to Wolters Kluwer's Offer  . .  23
N.  April 24, 1998, Special Meeting of Times Mirror's
    Board of Directors . . . . . . . . . . . . . . . . .  24
O.  Organization of CBM Acquisition Parent Co. and
    CBM MergerSub Corp. . . . . . . . . . . . . . . . . .  26
P.  Adoption of the Merger Agreement . . . . . . . . . .  28
Q.  GS Prepares "Fairness Package" for Bender
    Transaction  . . . . . . . . . . . . . . . . . . . .  34
R.  Melone Drafts Memorandum Regarding the Bender
    Transaction for E&Y's Files  . . . . . . . . . . . .  35
S.  May 7, 1998, Regular Meeting of Times Mirror's Board
    of Directors . . . . . . . . . . . . . . . . . . . .  37
T.  May 7, 1998, Annual Meeting of Times Mirror's
    Shareholders . . . . . . . . . . . . . . . . . . . .  37
U.  Organization of Liberty Bell I . . . . . . . . . . .  38
V.  July 9, 1998, Regular Meeting of Times Mirror's Board
    of Directors . . . . . . . . . . . . . . . . . . . .  38
W.  Execution of the LBI Limited Liability Company
    Agreement (the management authority) . . . . . . .  42
X.  Execution of MB Parent Stockholders Agreement and the
    MergerSub Shareholders Agreement . . . . . . . . .  50
Y.  Filing of the Restated Certificates of Incorporation
    for MB Parent and MergerSub  . . . . . . . . . . .  55

The Mechanics of the Bender Transaction . . . . . . . . . . .  72
A.  Capitalization of MergerSub and MB Parent  . . . . .  72
B.  Merger of MergerSub and Bender . . . . . . . . . . .  74
C.  Capitalization of LBI (the LLC)  . . . . . . . . . .  75
D.  Closing  . . . . . . . . . . . . . . . . . . . . . .  76

Times Mirror's Management of LBI and the Development of Times
Mirror's Investment Strategy Following the Closing of the
Bender Transaction . . . . . . . . . . . . . . . . . . . . .  76

Summary of the LLC's Investment Activity During 1999  . . . .  87

Times Mirror's and MB Parent's Income Tax Returns for 1998  .  87

Times Mirror's Financial Reporting Following the Close of
the Bender Transaction . . . . . . . . . . . . . . . . . . .  89

The LLC's Financial Statements for the Fiscal Years Ended
December 31, 1999 and 1998 . . . . . . . . . . . . . . . . . 103

IRS Determinations . . . . . . . . . . . . . . . . . . . . . 104

ULTIMATE FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . 106

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Factual Analysis of the Bender Transaction . . . . . . . . . 109

Times Mirror's View of the Bender Transaction . . . . . . . . 111

Fiduciary Obligations Among the Parties . . . . . . . . . . . 114

Consideration for the Transfer of Bender to Reed . . . . . . 118

Valuation of MB Parent Common Stock . . . . . . . . . . . . . 121

Pertinent Precedents . . . . . . . . . . . . . . . . . . . . 125

Evidentiary Matters . . . . . . . . . . . . . . . . . . . . . 133

COHEN, Judge:  Respondent determined a deficiency of $551,510,819 with respect to petitioner's Federal income tax for 1998.  The notice of deficiency recharacterized as taxable two transactions treated by petitioner as tax-free reorganizations.  This opinion addresses the so-called Bender transaction only.  The principal issues for decision are:

(1) Whether the Bender transaction qualifies as a reorganization under either section 368(a)(1)(A) and (2)(E) or section 368(a)(1)(B) and, if so,

(2) whether section 269 nonetheless dictates that gain be recognized on the Bender transaction.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner's principal place of business was in Chicago, Illinois, at the time that the petition was filed. Petitioner is a party to this case solely in its capacity as agent and successor of The Times Mirror Co., Inc. (Times Mirror).

Background

A. Times Mirror

Before its merger with petitioner, Times Mirror was a Los Angeles-based news and information company. In June 1995, Times Mirror hired Mark H. Willes (Willes) to serve as its president and chief executive officer. Willes became chairman of Times Mirror's board of directors in January 1996. Willes's business philosophy favored a streamlined operation that concentrated on "core" businesses.

After June 1995, Times Mirror embarked on a program of restructuring its businesses, which included focusing on newspaper publishing. In late 1996, Times Mirror undertook a series of transactions that resulted in its owning 50 percent of the Shepard's McGraw-Hill legal publishing unit (Shepard's) in a joint venture with Reed Elsevier (Reed), a publishing and information enterprise not itself a legal entity but rather a collective reference to Reed Elsevier plc, a United Kingdom

entity, and Reed Elsevier NV, a Dutch entity.  Times Mirror held its 50-percent interest in Shepard's through one of its subsidiaries, Matthew Bender & Co., Inc. (Bender), a legal publishing company.

As of December 31, 1997, Times Mirror comprised three business segments:  Newspaper publishing, professional information, and magazine publishing.  The professional information business segment included Bender and Mosby, Inc. (Mosby), a health sciences publishing company.

Times Mirror engaged in the legal publishing business through Bender.  TMD, Inc. (TMD), a wholly owned subsidiary of Times Mirror, owned the only class of issued and outstanding stock of Bender until July 31, 1998.

B.  Changes in the Legal Publishing Landscape

Between 1980 and 1997, the legal publishing industry experienced significant consolidation.  During that period, the legal publishing market contracted from 20 companies to 5:  Reed; Wolters Kluwer NV (Wolters Kluwer), a Dutch publishing and information company; West-Thomson; Bender; and the Bureau of National Affairs.

On October 13, 1997, Reed and Wolters Kluwer announced a plan to merge.  At the time of the announcement, Reed's holdings included Lexis-Nexis (Lexis), and Wolters Kluwer's holdings included Commerce Clearing House.

Shortly after the Reed-Wolters Kluwer announcement, Times Mirror's management analyzed Bender's competitive position in the legal publishing market. Based upon its analysis, Times Mirror's management concluded that continued participation in the legal publishing market was not the most effective use of Times Mirror's assets. Accordingly, Times Mirror decided to divest itself of Bender.

The law firm of Gibson, Dunn & Crutcher LLP (GD&C) acted as outside legal counsel for Times Mirror, TMD, and Bender in connection with the transaction pursuant to which Times Mirror divested itself of Bender (Bender transaction). Ernst & Young LLP (E&Y), which served as independent auditor of Times Mirror's financial statements during 1994 through 1999, reviewed the tax and accounting treatment and reporting of the Bender transaction for Times Mirror. Sometime before November 7, 1997, Times Mirror engaged Goldman, Sachs & Co. (GS) as a financial adviser and facilitator for the Bender transaction.

<u>Events Leading Up to the Bender Transaction</u>

    A.  <u>November 7, 1997, GS Presentation</u>

GS prepared a document, dated November 7, 1997, entitled "Monetization of Medical/Publishing Assets", in connection with a presentation to Times Mirror's management regarding the Bender transaction (November 7, 1997, GS presentation). The following

statements were included in the November 7, 1997, GS

presentation:

> #      Given the dramatic change in the competitive
>        landscape of the professional information
>        publishing sector, this may be an opportune time
>        for TMC [Times Mirror] to monetize its * * * legal
>        [publishing] assets
>
> #      Monetization of the * * * legal publishing assets
>        can be executed through a simple, taxable sale for
>        cash or through a number of tax-advantaged
>        structures
>
> #      The ultimate structure utilized will be a function
>        of the type of buyer (ie. Strategic or financial)
>        as well as the nationality of the buyer (ie.
>        Domestic or foreign) as well as the amount of cash
>        proceeds TMC would like to receive upfront

The November 7, 1997, GS presentation provided a summary of

Bender's potential buyers as well as descriptions of several of

GS's proprietary "tax-advantaged" structures for the Bender

transaction.  None of the tax-advantaged structures set forth in

the November 7, 1997, GS presentation were ultimately recommended

by Times Mirror's management or approved by Times Mirror's board

of directors for the Bender transaction.

> B.  November 17, 1997, Special Meeting of Times Mirror's
>     Board of Directors

A special meeting of Times Mirror's board of directors was

convened on November 17, 1997.  In connection with this special

meeting, a document entitled "Briefing Packet On Mosby Matthew

Bender" (November 17, 1997, briefing packet) was prepared.  A

memorandum dated November 14, 1997, from Willes to the board of

directors was part of the November 17, 1997, briefing packet.

The section of the November 17, 1997, briefing packet entitled

"Executive Summary" contained the following statements:

> The major strategic alternatives, or some combination thereof, that are open to Times Mirror are the following:
>
> 1. Hold
> 2. Divest
> 3. Swap
>
>         *     *     *     *     *     *     *
>
> A key issue in any decision to divest or swap will be the potentially large tax liability on the gain on the sale due to our low basis in Matthew Bender. Our preliminary work indicates that there may be a variety of transaction structures which allow us to minimize this tax expense.
>
>         *     *     *     *     *     *     *
>
> Our preliminary analysis shows that with the very high premiums currently being offered for legal * * * publishing operations, more after-tax value could be created through divestiture than by keeping these companies. This value is enhanced considerably if the divestiture could be accomplished through a tax-advantaged structure.
>
>         *     *     *     *     *     *     *
>
> The decision to explore strategic alternatives for Mosby Matthew Bender is not easy nor a happy one. * * * However, the facts are that the competitive environment for * * * legal * * * publishing has changed dramatically * * *. Matthew Bender is a very distant third in U.S. legal publishing with a weakening future competitive position. * * *
>
> Considering these recent developments, we recommend to the Board that it authorize the exploration of the divestiture of Matthew Bender, including Shepard's * * *

Willes opened the special meeting of the board of directors by noting that market consolidation in legal publishing presented immediate strategic questions that needed to be evaluated fully. Willes and Kathryn M. Downing, a corporate officer of Times Mirror, then presented a lengthy review of the situation and the issues to be addressed. Following this presentation, there was a substantive discussion among the board of directors. At the conclusion of this discussion, the board of directors unanimously instructed Times Mirror's management to proceed with a formal review of the company's options with respect to its ownership of Bender and its joint ownership of Shepard's.

C. Times Mirror's Announcement Sparks Interest by Reed and Wolters Kluwer

On November 24, 1997, Times Mirror released a statement to the public that announced the company's decision to explore strategic alternatives with respect to its ownership of Bender and its joint ownership of Shepard's. After Times Mirror made this announcement, Reed, Wolters Kluwer, and many others expressed an interest in acquiring Bender.

Parties that indicated an interest in Bender were initially sent a standard confidentiality agreement. These confidentiality agreements set out the ground rules for obtaining confidential information in connection with a possible sale or other disposition of Bender. On December 26, 1997, Times Mirror and

Reed executed a confidentiality agreement.  On January 9, 1998, GS sent a confidentiality agreement to Wolters Kluwer.

On February 2, 1998, Reed signed an addendum to the confidentiality agreement that it had executed with Times Mirror and delivered that addendum to Times Mirror.  The addendum expressed the desire of Reed and Times Mirror that Wolters Kluwer and Reed would jointly investigate and prepare a bid for Bender and/or Mosby.

D.  <u>February 5, 1998, Regular Meeting of Times Mirror's Board of Directors</u>

A regular meeting of Times Mirror's board of directors was convened on February 5, 1998.  At this meeting, the board of directors reviewed and discussed, among other topics, Times Mirror's strategic business plan for 1998 through 2000 and the company's financial structure.  These matters were also presented to the board of directors in the form of a written report.  In particular, the section entitled "Strategic Three-Year Plan" contained the following statements:

Mosby Matthew Bender Process

*    *    *    *    *    *    *

<u>Divestiture Process and Strategy</u>

On November 17, 1997, the Board held a study session that explored the changed strategic situation for Matthew Bender legal publishing, including Shepard's, and Mosby health sciences publishing.  * * *

*    *    *    *    *    *    *

Following the study session with the Board, we began the divestiture process.  Since that time, Mosby Matthew Bender management and Times Mirror staff have been actively working with Goldman Sachs to prepare financial statements and the offering memorandum and to identify potential buyers.

In this process, we have adopted the following strategy:

> *    *    *    *    *    *    *

- Acquaint all interested parties with our desire for a tax-efficient result and explore the appropriate alternatives in detail in advance of definitive bids with each party, because different forms of transactions work with different bidders.

- Since it could be the case that a leveraged spin-off would generate the same level of after-tax cash proceeds as an asset sale, establish "straw-man" values of a cash-for-assets sale and a leveraged spin-off (much like our cable transaction) to set a "floor" on the auction at a high level.

> *    *    *    *    *    *    *

Alternative Structures

The specific structure for the divestiture will depend largely on the financial and operating profile of the likely purchaser.  With the assistance and advice of Goldman Sachs, Ernst & Young, and Gibson, Dunn & Crutcher, this process is being integrated with the overall sale process to deliver the highest after-tax value to Times Mirror and its shareholders.  * * *

> *    *    *    *    *    *    *

Planning Issues

Since we are early in the process, it is not clear what the impact of this divestiture will be on Times Mirror's financial results.  * * *  The preferred tax-efficient structures we will explore with potential buyers would significantly lessen any potential dilution.  * * *  [I]t is important to remember that

the model we developed for 10% or greater growth in earnings per share did not anticipate continuing contributions from Mosby Matthew Bender, and the proceeds will give us a large body of resources to invest to accelerate the Company's growth.

\*     \*     \*     \*     \*     \*     \*

CAPITALIZATION

Introduction

The new three year plan has five principal capitalization policies:

1)   Continue an active share repurchase plan, buying shares when repurchase is the best investment of our financial resources

\*     \*     \*     \*     \*     \*     \*

5)   Invest our cash flow and other capital resources according to the following priorities:

- Internally in products and services that build our established operations

- Attractive acquisitions that add to or are complimentary [sic] to existing businesses

- Opportunistically in common stock repurchase

- Dividends

Our plan provides sufficient cash flow and other resources to cover all of these applications.  In practice (and in the absence of a Mosby-Matthew Bender transaction) for the plan period, the application of these policies is expected to result in the following actions:

- Repurchases of \* \* \* 4 million in 1998 and 3 million in each of 1999 and 2000 for an aggregate of $570 million

- 14 -

- We expect to borrow approximately $250 million to use with our free cash flow to finance internal development, acquisitions, and share repurchase

- Our common dividend will increase by 20% and then approximately 10% per year

- We will maintain a reserve of borrowing capacity and cash flow generation sufficient to fund our internal investment and acquisition programs

If the form of the Mosby-Bender transaction is a cash sale, we would undoubtedly increase the amount of the share repurchase target and not borrow additional funds during the plan period.

*     *     *     *     *     *     *

Our plan going forward, unless the Mosby-Bender transaction produces an unanticipated result, is to continue our repurchase activity in the same manner [as pursued from 1995 through 1997].  * * *

Following the Mosby-Bender transaction we will, once again, look at our repurchase volume target in light of what could be significantly enhanced resources for investment, and weigh the same factors to guide our program.  * * *

E.  March 5, 1998, Regular Meeting of Times Mirror's Board of Directors

A regular meeting of Times Mirror's board of directors was convened on March 5, 1998.  At this meeting, Thomas Unterman (Unterman), executive vice president and chief financial officer of Times Mirror, with the assistance of several GS representatives, reported on the status of the strategic review regarding Bender.  These matters were also presented to the board of directors in a written report.  In particular, the section

entitled "Structural Alternatives" contained the following statements:

#   Structuring Goals

-   Maximize after-tax value to Times Mirror and its shareholders

-   Integrate structural considerations into sale process

-   Achieve desired accounting results at time of sale (and possibly on an ongoing basis)

F.  Reed and Wolters Kluwer Call Off Merger

On March 9, 1998, Reed and Wolters Kluwer called off their previously announced merger.  On March 18, 1998, Wolters Kluwer faxed to GS an executed confidentiality agreement regarding Bender.

G.  Melone, Sigler, and Walker Gain Access to the "Domestic Sandwich" Structure

On March 24, 1998, three members of E&Y, Martin R. Melone (Melone), Mary Ann Sigler (Sigler), and Kenneth M. Walker (Walker), entered into an agreement entitled "Nondisclosure and Confidentiality Agreement" with Price Waterhouse LLP (PW).  At the time that they entered into the Nondisclosure and Confidentiality Agreement with PW, Melone was the "Partner-in-Charge" of E&Y's audit of Times Mirror, Sigler was a tax partner at E&Y, and Walker was an engagement partner at E&Y.  The Nondisclosure and Confidentiality Agreement pertained to the following:

PW has in the course of its business developed a technique for restructuring a corporate group (known within PW as the "Domestic Sandwich") that is confidential to PW and has substantial pecuniary value to PW (the "Proprietary Technique"), which is the subject of this agreement.

PW desires to provide to Individuals [Sigler, Melone, and Walker], and Individuals desire to obtain from PW, a full and complete description of the Proprietary Technique to enable Individuals to review the Proprietary Technique and determine whether it [sic] wishes to use the Proprietary Technique.

As a result of entering into the Nondisclosure and Confidentiality Agreement with PW, Melone, Sigler, and Walker gained access to PW's "Domestic Sandwich" structure.

H. Reed and Wolters Kluwer Submit Preliminary Interest Letters to Times Mirror

On April 7, 1998, Wolters Kluwer submitted a letter to Times Mirror that indicated Wolters Kluwer's preliminary interest in acquiring Bender and Times Mirror's 50-percent interest in Shepard's. In its preliminary interest letter, Wolters Kluwer made the following statement regarding the offer price and form of consideration for this acquisition: "Wolters Kluwer is prepared to acquire all of the outstanding stock of the Company [Bender and Times Mirror's 50-percent interest in Shepard's] for cash consideration of U.S. $1.5 billion."

Reed also submitted a letter to Times Mirror on April 7, 1998, that indicated Reed's preliminary interest in acquiring Bender, Mosby, and Times Mirror's 50-percent interest in Shepard's. In its preliminary interest letter, Reed made the

following statement regarding the offer price and form of consideration for this acquisition:

> Based on the information contained in the information memorandum on Matthew Bender and Mosby dated March 1998 and the supplemental information delivered to us on April 2, 1998, and in particular the actual and forecast financial results for the Properties contained in those documents, our preliminary evaluation of the Properties permits us to indicate that we would be prepared to pay at least $1.2 Billion, which amount is assumed to be payable in cash on completion.

The individuals involved in coordinating the Bender transaction for Times Mirror were referred to as the Project Philadelphia Group. As of April 7, 1998, the Project Philadelphia Group included officers, directors, and employees from the following entities: Times Mirror, Mosby, Bender, GS, GD&C, E&Y, and PW.

I. The Corporate Joint Venture Structure Is Tabbed as the Structure of Choice for the Bender Transaction

On April 10, 1998, Daniel Shefter (Shefter), an associate at GS, faxed a revised copy of a document entitled "Presentation Regarding Corporate Joint Venture Structure" (Shefter CJV presentation) to members of the Project Philadelphia Group. The "Corporate Joint Venture Structure" (CJV structure) depicted in this document was the transaction structure ultimately chosen to accomplish the Bender transaction.

After Times Mirror had become comfortable with the CJV structure, it incorporated that structure into the draft agreements reflecting the details of the Bender transaction.

Times Mirror also informed prospective bidders that any bids for Bender that did not incorporate the use of the CJV structure would be severely disadvantaged in comparison to those bids that did.

### J. April 14, 1998, Regular Meeting of Reed's Board of Directors

A regular meeting of Reed's board of directors was convened on April 14, 1998, at which Herman S. Bruggink (Bruggink), co-chairman of Reed, discussed Reed's potential acquisition of Bender, Mosby, and Times Mirror's 50-percent interest in Shepard's. During this discussion, Bruggink noted that Times Mirror was conducting a competitive bidding process for these businesses and that Reed's ability to respond on extremely short notice and Reed's willingness to bid aggressively would be crucial to a successful outcome. Upon completing this discussion, Reed's board of directors approved resolutions regarding Reed's acquisition of Bender, Mosby, and Times Mirror's 50-percent interest in Shepard's for an aggregate purchase price not in excess of $2 billion. Reed's board of directors authorized this $2 billion purchase price based upon, inter alia, Reed's solid cash position at that time.

### K. Wolters Kluwer and Reed Attend Times Mirror's Presentations Regarding Bender

Between April 13 and 17, 1998, Times Mirror's management held discussions with and made separate presentations regarding

Bender to Wolters Kluwer and to Reed at Times Mirror's offices in New York City.  During these meetings, PW and GS made presentations regarding the CJV structure to Wolters Kluwer and to Reed.  No other structures for potential acquisition of Bender were discussed during these meetings.

The CJV structure presented to Wolters Kluwer and to Reed depicted Times Mirror as owning 100 percent of the stock of the "target", i.e., Bender, and described the following five steps by which the acquiror would acquire the target (with dollar amounts for illustrative purposes only):

> 1.  Acquiror capitalizes Newco at $1,000 with voting and nonvoting common stock and preferred stock. The voting common stock has a value of $950 and 20% of the vote and represents approximately 98% of the total common equity of Newco.  The nonvoting common stock has a value of $20, is non-voting and represents approximately 2% of the total common equity of Newco. The Preferred stock has a value of $30 and 80% of the vote.  Combined, the Newco preferred and non-voting common will have a value equal to 5% of the total equity value of Newco.

> *    *    *    *    *    *    *

> 2.  Acquiror contributes Newco preferred and Non-Voting Common stock to MB Parent in exchange for MB Parent preferred.

> *    *    *    *    *    *    *

> 3.  Newco buys MB parent common with 20% of the vote for $1,000.

> *    *    *    *    *    *    *

> 4.  Target merges with Newco with Target surviving.  (Alternatively, Newco could be surviving

company.)  In exchange for its Target Stock, Times Mirror will receive 100% of MB Parent common stock.

* * * * * * *

5.  [MB] Parent contributes $1,000 to LLC in exchange for non-voting LLC interest.

Times Mirror is sole manager of LLC but is not a member of the LLC.

An April 22, 1998, memorandum from Charles P. Fontaine (Fontaine), director of taxes for Reed, to Ian Malcolm ("Mac") Highet, executive vice president of corporate development for Reed, posed the following questions regarding the dividend requirements of the CJV structure:

Are current dividends required to be paid on the MB preferred stock or the MB Parent preferred stock?

Can dividends not be paid until the MB preferred stock is redeemed?

Is a dividend rate of 5% acceptable?

Shefter, for GS, and Hatef Behnia (Behnia), a partner at GD&C, responded to these questions in the following manner:

Current dividends are required to be paid on both classes of preferred stock.

Dividends cannot be deferred until the preferred stocks are redeemed.

A dividend rate in the range of 5.0 to 5.5% is acceptable (5% is likely to be used).  The dividend rate will be some rate below Treasuries * * *

Fontaine posed the following questions regarding the restrictions on transfers:

Can the Target [Bender] after the merger contribute its assets to a partnership joint venture with another Reed Elsevier company?

After two (2) years, can Reed Elsevier dispose of the stock of Target by transferring the entire merger structure to a third party?

After five (5) years, can Reed Elsevier unwind the merger structure and dispose of the Target in any manner?

Can Reed Elsevier dispose of certain assets and lines of business within two (2) years without Seller's consent?

Shefter and Behnia responded to these questions in the following manner:

The Target cannot contribute its assets to a partnership following the merger.

As described in the revised documents, after two years Reed could dispose of the company by transferring the entire structure.

Note, however, that Reed must represent that at the time of the acquisition it has no plan or intent to dispose of the acquired company or its assets and will covenant that it will not dispose of the acquired company or its assets within two years

After five years Reed cannot "unwind" the structure. It will, however have the ability to sell all the stock of Target, <u>provided however, that the sale cannot be to an affiliate of Reed</u>.

Reed cannot dispose of assets or certain lines of businesses within two years.

Fontaine posed the following questions regarding the terms of the LLC agreement:

Will the agreement contain some restrictions on the use of the cash?

Will LLC be obligated to distribute cash to MB Parent in order to permit MB Parent to pay its tax and any other liabilities?

Shefter and Behnia responded to these questions in the following manner:

The LLC agreement will not contain any restrictions on the use of the cash.

The LLC will be obligated to make cash distributions to MB Parent in order to permit MB Parent to pay tax liabilities, dividends on the MB Parent preferred stock and other general expenses of MB Parent.

L.  <u>Wolters Kluwer and Reed Submit Offers to Times Mirror</u>

By letter dated April 22, 1998, Wolters Kluwer submitted to Times Mirror an offer to acquire Bender and Times Mirror's 50-percent interest in Shepard's for a total of $1.4 billion.  In its offer letter, Wolters Kluwer made the following statement regarding the offer price and form of consideration for this acquisition:

Wolters Kluwer is prepared to acquire 100% of Matthew Bender and TMC's [Times Mirror's] 50% interest in Shepard's for aggregate consideration of US$ 1.400 billion, which we would propose to allocate US$ 1.150 billion for Matthew Bender and US$ 250 million for Shepard's * * *.

Wolters Kluwer also stated that it was prepared to acquire Bender substantially in the form of the CJV structure.  Wolters Kluwer's offer was conditioned on Times Mirror's negotiating exclusively with Wolters Kluwer.

After Times Mirror received Wolters Kluwer's offer but before Times Mirror entered into an exclusive negotiation period

with Wolters Kluwer, Times Mirror informed Reed that it had received a significant offer from another bidder that had accepted the use of the CJV structure for the Bender transaction. Times Mirror also informed Reed that Reed would have to respond promptly if it wished to remain in the running for Bender and Times Mirror's 50-percent interest in Shepard's.

By letter dated April 23, 1998, Reed submitted to Times Mirror an offer to acquire Bender and Times Mirror's 50-percent interest in Shepard's "for a cash consideration of $1.65 billion and on the terms and conditions reflected in the mark-up of the Agreement and Plan of Merger."  In its offer letter, Reed accepted the use of the CJV structure for its purchase of Bender. Reed's offer was conditioned on Times Mirror's acceptance of the offer by Friday, April 24, 1998, at 5 p.m. "(Los Angeles time)".

M.  Times Mirror Responds to Wolters Kluwer's Offer

On April 23, 1998, Unterman sent a letter to Wolters Kluwer in response to Wolters Kluwer's offer to acquire Bender and Times Mirror's 50-percent interest in Shepard's.  Unterman included the following statements in this letter:

> there is one aspect of the proposal which is structurally defective, and precludes us from complying with the conditions set forth in your letter.  The insertion in your mark-up of a guaranty by MB Parent of Matthew Bender's post-Merger indebtedness to you materially changes the economic and risk profile of the transaction in that it creates a significant contingent liability for MB Parent, the repository of our sales proceeds.  While we assume that you did not intend this provision as a mechanism to place our sales proceeds at

risk, when questioned on the point, your counsel did not withdraw it and your counsel did indicate that it did represent an addition to our proposed structure designed to create leverage for you in other circumstances.

In addition, Unterman made the following statements in an attachment to this letter:

1.  <u>Guaranty</u>.  The mark-up proposes that MB Parent guaranty the secured debt of MergerSub to Acquiror.  This proposal would result in the assets of the LLC being placed at risk and is unacceptable.

N.  <u>April 24, 1998, Special Meeting of Times Mirror's Board of Directors</u>

A special meeting of Times Mirror's board of directors was convened on April 24, 1998.  A document entitled "Mosby Matthew Bender Update" was prepared for this meeting (April Bender update).  The April Bender update listed the following as one of Times Mirror's major accomplishments since the March 5, 1998, meeting of Times Mirror's board of directors:

As part of our effort to minimize the tax liability on the divestiture, we continued to look for tax-efficient structures.  A potential approach that is superior to the structures reviewed at last month's Board meeting was brought to us by Price Waterhouse through Goldman Sachs.  This approach is proprietary to Price Waterhouse and is subject to a confidentiality agreement.  * * *

The April Bender update also included a section entitled "New Tax Minimization Approach" that contained the following:

The Price Waterhouse structure separates ownership and control so that the acquiring company controls Matthew Bender and Times Mirror controls an amount of cash

equivalent to Matthew Bender's value, but without having paid a tax for the shift in control.

The steps in this structure * * * involve the creation of a special purpose corporation (referred to as MB Parent * * *) that is owned partly by Times Mirror and partly by the acquiring company. This special purpose corporation is controlled by the acquiring company through its ownership of relatively low value, nonparticipating preferred stock with 80% voting control. MB Parent in turn owns preferred stock and nonvoting common stock in an acquisition subsidiary that will merge with Matthew Bender and a nonvoting interest in a single member limited liability company that holds the cash referred to above. As a result of the merger of Matthew Bender into the acquisition subsidiary, Times Mirror will own all of the common stock and remaining 20% voting power of MB Parent, the special purpose corporation. However, even though Times Mirror will not have voting control over MB Parent, it will control the limited liability corporation holding all of the cash by virtue of being the sole (nonequity) manager of the LLC.

The results are as follows:

- Times Mirror will control the LLC, thereby controlling the cash in it and any assets or businesses acquired with such cash.

- Times Mirror and the LLC will be consolidated for financial reporting purposes.

- The acquiring company will control Matthew Bender and will be able to consolidate for financial reporting purposes.

- The merger of Matthew Bender into the acquisition subsidiary in exchange for MB Parent common stock will qualify as a tax-free reorganization for tax purposes (even though such common stock does not carry with it voting control).

- MB Parent, the LLC and Matthew Bender will not be consolidated for tax purposes with either Times Mirror or the acquiring company.

- At some later date and upon mutual agreement, the Matthew Bender and MB Parent preferred stock can be redeemed at face value and the nonvoting common can be redeemed at a formula price, which would leave the acquiring company as the sole owner of Matthew Bender and Times Mirror as the sole, and controlling owner of MB Parent, with the ability to liquidate MB Parent and the LLC without a tax cost.

During the special meeting of the board of directors, Willes, Unterman, and Behnia made presentations concerning the proposed transaction and the competing bids received from Wolters Kluwer and Reed.

At the conclusion of this discussion, the board approved resolutions related to the Bender transaction. As part of these resolutions, the board accepted Reed's offer for Bender and Times Mirror's 50-percent interest in Shepard's.

O.  Organization of CBM Acquisition Parent Co. and CBM MergerSub Corp.

On April 24, 1998, two of Reed's wholly owned subsidiaries, Reed Elsevier Overseas BV (REBV), a Dutch private limited liability company, and Reed Elsevier U.S. Holdings, Inc. (REUS), a Delaware corporation, organized CBM Acquisition Parent Co. (MB Parent) by filing a certificate of incorporation with the secretary of state of the State of Delaware. MB Parent's bylaws included the following provisions:

ARTICLE 2

MEETINGS OF STOCKHOLDERS

* * * * * * *

SECTION 2.05.  Quorum.  Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.

SECTION 2.06.  Voting.  (a) Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder.  Unless otherwise provided in Delaware Law, the certificate of incorporation or these bylaws, the affirmative vote of a majority of the shares of capital stock of the Corporation present, in person or by proxy, at a meeting of stockholders and entitled to vote on the subject matter shall be the act of the stockholders.

* * * * * * *

SECTION 2.07.  Action by Consent.  (a) Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  * * *  Prompt notice of the taking of the corporate action without a

meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

> \*   \*   \*   \*   \*   \*   \*

## ARTICLE 3

## DIRECTORS

> \*   \*   \*   \*   \*   \*   \*

SECTION 3.03. <u>Quorum and Manner of Acting</u>. Unless the certificate of incorporation or these bylaws require a different number, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at [a] meeting at which a quorum is present shall be the act of the Board of Directors. \* \* \*

As of the time of trial of this case, MB Parent's bylaws had never been amended.

On April 27, 1998, REBV and REUS organized CBM MergerSub Corp. (MergerSub) by filing a certificate of incorporation with the secretary of state of the State of New York.

P. <u>Adoption of the Merger Agreement</u>

On April 26, 1998, a document entitled "Agreement and Plan of Merger", prepared by GD&C, was presented to representatives of Times Mirror, TMD, Bender, REUS, REBV, MB Parent, and CBM Acquisition Corp. The Agreement and Plan of Merger set forth the terms and details of the Bender transaction. On that same date, the boards of directors of TMD, Bender, REUS, REBV, and MB Parent adopted resolutions that approved each of those corporation's engaging in the Bender transaction.

On April 27, 1998, representatives of Times Mirror, TMD, Bender, REUS, REBV, MB Parent, and MergerSub executed an agreement entitled "Amended and Restated Agreement and Plan of Merger" (the Bender agreement). Through the Bender agreement, MergerSub replaced CBM Acquisition Corp. as a party to the Bender transaction. The Bender agreement superseded the Agreement and Plan of Merger in its entirety.

The recitals to the Bender agreement stated, in pertinent part, the following:

> WHEREAS, the TM Parties [Times Mirror, TMD, and Bender, collectively], Acquiror [REUS and REBV, collectively], MB Parent, and CBM Acquisition Corp. have entered into an Agreement and Plan of Merger dated as of April 26, 1998 (the "Existing Merger Agreement");

> WHEREAS, the TM Parties and the Reed Parties [REUS, REBV, MB Parent, and MergerSub, collectively] desire to amend and restate the Existing Merger Agreement on the terms and subject to the conditions set forth in this Agreement;

> WHEREAS, in anticipation of the Merger (as defined in Section 1.1), MB Parent will file a Restated Certificate of Incorporation of MB Parent * * * with the Secretary of State of the State of Delaware;

> WHEREAS, in anticipation of the Merger, MergerSub will file a Restated Certificate of Incorporation of MergerSub * * * with the Secretary of State of the State of New York;

> WHEREAS, immediately prior to the Effective Time (as defined below), in consideration of an amount in cash equal to $1,375,000,000 less the net proceeds received by MergerSub from the MergerSub Debt (as defined below) from REUS and REBV, MergerSub will issue to REUS (i) seven hundred and ninety-two (792) shares of Common Stock, par value $.01 per share, of MergerSub ("MergerSub Common Stock"), which MergerSub Common

Stock will have 16% of the voting power of all of the outstanding shares of capital stock entitled to vote in an election of directors ("Voting Power") and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MergerSub Certificate of Incorporation, (ii) 75% of the authorized shares of Nonvoting Participating Preferred Stock, par value $.01 per share, of MergerSub ("MergerSub Participating Preferred Stock"), and (iii) 75% of the authorized shares of Voting Preferred Stock, par value $.01 per share, of MergerSub ("MergerSub Preferred Stock"), which MergerSub Preferred Stock will have 60% of the Voting Power and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MergerSub Certificate of Incorporation and MergerSub will issue to REBV (i) one hundred and ninety-eight (198) shares of MergerSub Common Stock, which MergerSub Common Stock will have 4% of the Voting Power and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MergerSub Certificate of Incorporation, (ii) 25% of the authorized shares of MergerSub Participating Preferred Stock, which MergerSub Participating Preferred Stock will have no Voting Power and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MergerSub Certificate of Incorporation and (iii) 25% of the authorized shares of MergerSub Preferred Stock, which MergerSub Preferred Stock will have 20% of the Voting Power and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MergerSub Certificate of Incorporation;

WHEREAS, immediately prior to the Effective Time (as defined in Section 1.3), MergerSub will borrow $600,000,000 on terms not inconsistent with the terms set forth in Section 7.8 ("MergerSub Debt") from an affiliate of Acquiror;

WHEREAS, immediately prior to the Effective Time, in consideration for 75% of the authorized and outstanding shares of MergerSub Participating Preferred Stock held by REUS, MB Parent will issue to REUS 75% of the authorized shares of Voting Preferred Stock, par value $.01 per share, of MB Parent ("MB Parent Preferred Stock"), which MB Parent Preferred Stock will have 60% of the Voting Power and such other

designations, preferences, voting powers, rights and qualifications as are set forth in the MB Parent Certificate of Incorporation;

WHEREAS, immediately prior to the Effective Time, in consideration for 25% of the authorized and outstanding shares of MergerSub Preferred Stock and 25% of the authorized and outstanding shares of MergerSub Participating Preferred Stock held by REBV, MB Parent will issue to REBV 25% of the MB Parent Preferred Stock, which MB Parent Preferred Stock will have 20% of the Voting Power and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MB Parent Certificate of Incorporation;

WHEREAS, immediately prior to the Effective Time, in consideration for $1,375,000,000, MB Parent will issue to MergerSub 100% of the authorized shares of Common Stock, par value $.01 per share, of MB Parent ("MB Parent Common Stock"), which MB Parent Common Stock will have 20% of the Voting Power and such other designations, preferences, voting powers, rights and qualifications as are set forth in the MB Parent Certificate of Incorporation;

WHEREAS, in anticipation of the Merger, MB Parent will cause Liberty Bell I, LLC, a single-member Delaware limited liability company ("LLC") to be formed under the laws of the State of Delaware prior to the Effective Time by filing with the Secretary of State of the State of Delaware the Certificate of Formation of LLC * * *;

WHEREAS, in anticipation of the Merger, MB Parent, an affiliate of MB Parent and Times Mirror will enter into a Limited Liability Company Agreement of LLC pursuant to which the affiliate of MB Parent shall be appointed the initial manager of LLC and, immediately after the Effective Time, Times Mirror shall be appointed the manager of LLC * * *;

WHEREAS, immediately after the Effective Time, in accordance with the terms of the LLC Agreement, MB Parent will make a contribution to LLC in the amount of $1,375,000,000;

In the Bender agreement, Reed and Times Mirror agreed, in pertinent part, to the following:

> SECTION 1.1.  The Merger.  At the Effective Time (as defined in Section 1.3) and upon the terms and subject to the conditions of this Agreement and in accordance with the New York Business Corporation Law * * *, MergerSub shall be merged with and into * * * [Bender] (the "Merger").  Following the Merger, * * * [Bender] shall continue as the surviving corporation (the "Surviving Corporation") and the separate corporate existence of MergerSub shall cease.  The Merger is intended to qualify as a tax-free reorganization under Section 368 of the Code.

> *   *   *   *   *   *   *

> SECTION 1.8.  Conversion of Shares.

> (a) Merger Consideration.  At the Effective Time, each share of common stock, par value $100.00 per share, of * * * [Bender] (individually a "Share" and collectively the "Shares") issued and outstanding immediately prior to the Effective Time (other than Shares held in * * * [Bender's] treasury or by any of * * * [Bender's] Subsidiaries), all of which are owned by TMD, shall, by virtue of the Merger and without any action on the part of MergerSub, * * * [Bender] or the holder thereof, be converted into and shall become the right to receive a number of the fully paid and nonassessable shares of MB Parent Common Stock held by MergerSub immediately prior to the Effective Time equal to a fraction, the numerator of which is the number of shares of MB Parent Common Stock held by MergerSub immediately prior to the Effective Time and the denominator of which is the number of Shares outstanding immediately prior to the Effective Time (the "Merger Consideration").

> *   *   *   *   *   *   *

> SECTION 1.10.  Exchange of Certificates.

> *   *   *   *   *   *   *

> (c) Effect of Exchange.  All shares of MB Parent Common Stock issued upon the surrender of

certificates representing Shares in accordance with the terms hereof shall be deemed, to the fullest extent permitted by applicable law, to have been issued in full satisfaction of all rights pertaining to such Shares * * *

                *     *     *     *     *     *     *

SECTION 2.4.  Conditions to TM Parties' Obligations.  The obligations of the TM Parties to consummate the Merger are subject to the satisfaction (or waiver by each of the TM Parties) as of the Effective Time of the following conditions:

                *     *     *     *     *     *     *

        (f) Legal Opinions.

                *     *     *     *     *     *     *

        (ii) Times Mirror shall have received a favorable opinion of its legal counsel, in form and substance reasonably satisfactory to it, as to the qualification of the Merger as a reorganization under the provisions of Section 368 of the Code.

SECTION 2.5.  Substitution Transaction.  In the event that the condition to the obligations of Times Mirror, TMD and * * * [Bender] to consummate the Closing contained in Section 2.4(f)(ii) is not satisfied or waived by October 31, 1998 or such earlier date on which all other conditions in Sections 2.1, 2.2 and 2.4 have been satisfied or waived (the "Revision Date") then * * * (iii) for a period of 45 days from the Revision Date (the "Renegotiation Period"), Acquiror and Times Mirror shall enter into bona-fide negotiations with a view to determining whether agreement can be reached as to the terms and conditions upon which the transactions contemplated by this Agreement may be structured so as to replicate as much as practicable the relative economic benefits that each party and their Affiliates would have derived from the transactions contemplated by the Agreement (any such restructured transaction hereafter referred to as the "Substitution Transaction"), (iv) unless the parties agree to the terms and conditions of a Substitution Transaction during the Renegotiation Period, as soon as practicable following the expiration of such period,

Times Mirror shall sell to REUS and REUS shall purchase from Times Mirror, all the outstanding shares of * * * [Bender] for a cash purchase price of $1,375,000,000 * * *

        *     *     *     *     *     *     *

SECTION 7.7. <u>Enforceability of LLC Agreement</u>. The Reed Parties will not commence, maintain, or join any action (at law or otherwise) that asserts that the LLC Agreement is unenforceable.

On April 28, 1998, the board of directors of MergerSub adopted resolutions that approved MergerSub's engaging in the Bender transaction.

Q. <u>GS Prepares "Fairness Package" for Bender Transaction</u>

On or about April 27, 1998, GS prepared a document entitled "Fairness Package" with respect to the Bender transaction and Times Mirror's sale of its 50-percent interest in Shepard's. The Fairness Package included a page entitled "Summary of Proposed Transaction" that described the structure and consideration for the Bender transaction and Times Mirror's sale of its 50-percent interest in Shepard's in the following manner:

> \#      Purchase of 100% of the stock of * * * [Bender] and Times Mirror's 50% partnership interest in * * * [Shepard's] for $1.65 billion in cash
>
> > -      Purchase of * * * [Bender] for $1.4 billion using the PW tax-advantaged structure ("PW Structure")
> >
> > -      Purchase of * * * [Shepard's] for $250 million with a section 338(h)(10) election

The Fairness Package also included a page entitled "Summary of Financial Impact" that listed Times Mirror's "After-tax Cash Proceeds from Sale" using the CJV structure as $1,641,500,000. GS determined this $1,641,500,000 amount by assuming (1) a $1.4 billion "tax-free" purchase of Bender and (2) that the sale of Times Mirror's 50-percent interest in Shepard's would generate $241.5 million in after-tax proceeds.

R. Melone Drafts Memorandum Regarding the Bender Transaction for E&Y's Files

On or about April 29, 1998, Melone drafted a memorandum entitled "Times Mirror Matthew Bender Sale" for E&Y's files. Melone included the following statements regarding the Bender transaction and Times Mirror's sale of its 50-percent interest in Shepard's in this memorandum:

> Times Mirror has entered into an agreement with Reed Elsevier for the sale of Matthew Bender for $1,375,000,000 and the sale of Times Mirror's interest in Shepard's Inc. for $225,000,000. The sale of Matthew Bender is structured as a reorganization in which the $1,375 million proceeds from the sale will end up in an LLC whose ownership is as shown in the attached chart. Through the various shareholder agreements, certificates of incorporation and the LLC management agreement, Times Mirror has total control over the assets and operations of the LLC and Reed Elsevier has total control over the assets and operations of Matthew Bender. The structure is designed to result in no tax due by Times Mirror on the profit from the sale of Matthew Bender.

> \* \* \* \* \* \* \*

Consolidation

* * *  Times Mirror controls the assets of the LLC through the management agreement, which specifically states that Times Mirror has no fiduciary duty to the holder of Acquisition Parent [MB Parent] and may use its discretion as to the use of the assets.  Times Mirror may have the LLC buy its own debt instruments or Times Mirror stock, make business acquisitions or any other transaction to the benefit of Times Mirror.  The only limitation is that Times Mirror may not upstream LLC assets to itself.

Times Mirror owns all of the common stock of Acquisition Parent and the 20% vote it carries.  The ownership of the common stock provides Times Mirror with 100% of the residual ownership and value of Acquisition Parent following redemption of the preferred stock, which is virtually assured in at least 20 years due to the redemption rights and certain put and call options.  The equity value of the preferred stock is limited to its stated (redemption) value and fixed dividend payments.

Times Mirror has the ability to ensure that the Board of Directors of Acquisition Parent may not do anything that may affect the control or viability of the LLC. Certain board actions require the unanimous vote of the Board.  These include:

- the incurrence of indebtedness or guarantees of indebtedness of Acquisition Parent

- the sale, transfer or other disposition, pledge or assignment of any portion or all of its LLC interest

- the issuance of any other securities of Acquisition Parent

All of these factors indicate that Times Mirror not only controls the assets of the LLC, but also is the beneficiary of all of the ownership risks and rewards of the LLC.  * * *

S.  May 7, 1998, Regular Meeting of Times Mirror's Board
    of Directors

A regular meeting of Times Mirror's board of directors was
convened on May 7, 1998.  A document entitled "Mosby Matthew
Bender Divestiture Update" was presented to Times Mirror's board
of directors at this meeting (May Bender update).  The May Bender
update included the following statements:

> Following the special Board meeting on Friday,
> April 24, we began exclusive negotiations with Reed
> Elsevier for the divestiture of Matthew Bender and our
> 50% interest in Shepard's.  Negotiations started Friday
> afternoon and continued for most of the day Saturday.
> Contracts and press releases were finalized Saturday
> night and signed on Sunday, after all corrections to
> the contracts had been made.  The transaction was in
> line with the parameters reviewed with the Board, with
> a total value of $1.65 billion.  Matthew Bender will be
> divested through a merger that takes advantage of the
> proprietary tax structure that was presented to the
> Board.  Pending the customary regulatory review, the
> transaction is expected to be completed this summer.

T.  May 7, 1998, Annual Meeting of Times Mirror's
    Shareholders

Times Mirror's annual shareholder meeting was convened on
May 7, 1998.  At this meeting, Willes discussed, among other
topics, Times Mirror's "decision to sell * * * [Mosby and Matthew
Bender] for strategic reasons."  Willes made the following
remarks with respect to this topic:  "You have read in recent
days that we have reached agreements to sell Matthew Bender, and
our 50% interest in Shepard's for $1.65 billion.  We have also
agreed to sell Mosby for $415 million.  This is a phenomenal
amount of money for some phenomenal businesses."

U.  Organization of Liberty Bell I

On May 22, 1998, Michael S. Udovic (Udovic), assistant general counsel for Times Mirror, filed the Certificate of Formation for Liberty Bell I, LLC (LBI), with the secretary of state of the State of Delaware.  On May 26, 1998, Udovic resigned from his position as the authorized person of LBI.  LBI did not have an authorized person between the time of Udovic's resignation and July 28, 1998.

V.  July 9, 1998, Regular Meeting of Times Mirror's Board of Directors

A regular meeting of Times Mirror's board of directors was convened on July 9, 1998, at which the board of directors discussed, among other topics, the pending Bender transaction.  According to the minutes of this meeting, Unterman discussed the following matters with the board of directors:

> Thomas Unterman * * * reviewed the pending transactions involving Mosby and Matthew Bender and their impact upon the Company's financial projections, concluding that Times Mirror remained on target to meet each of its major financial objectives for the year.  He noted that the proceeds from the dispositions of these businesses will be received by two limited liability companies and, utilizing materials previously furnished to the Board of Directors, discussed the short-term investment strategies Times Mirror will follow in connection with its management of those companies.

These matters were also presented to the board of directors in a written report.  In particular, the section entitled "Finance Report" contained the following statements:

FINANCE REPORT

INTRODUCTION

Our financial objectives for this year included:

a)   earnings growth of 20%,

b)   continued use of every available opportunity to finance investment in the growth of our businesses * * *,

c)   optimization of the proceeds from the Mosby Matthew Bender disposition so that future year dilution is minimized, and

d)   continuation of return on capital in excess of 12%.

At mid-year we can report that we are still on this course and all of our corporate objectives for the year are both in sight and within reach.  While there are more "moving pieces" than usual, there are four major items to note:

•   First, as expected, following the Mosby Matthew Bender (MMB) agreements, we are required to treat MMB as discontinued operations and the "street" has recalibrated our performance to a continuing earnings basis and will track us this way from now on.

         *    *    *    *    *    *    *

•   Third, in light of the very large MMB gain on sale, we have begun to review our entire balance sheet, our work processes, and all of our systems to determine if appropriate charges, write-offs, or buy-down/buy-outs of contracts might prove beneficial.  * * *

•   Fourth, as is discussed under a separate tab entitled Capitalization/Investment, following the MMB sale, we will have a very substantial level of resources for redeployment over time in operating assets and for recapitalization.

         *    *    *    *    *    *    *

GAIN ON SALE AND DISCONTINUED EARNINGS REPORTING

* * *  By divesting MMB, we are completely exiting the legal and health sciences publishing business, and are required to separately report MMB earnings as discontinued operations.  Similarly, the gain on sale appears in the discontinued line.

   *  *  *  *  *  *  *

* * *  We will receive over $2.0 billion in cash from the sale.  * * *

   *  *  *  *  *  *  *

BALANCE SHEET REVIEW

After the magnitude of the gain on the MMB sale became apparent, we decided to use this opportunity to conduct a thorough examination of our balance sheet, operations and investments to see what actions we could take to benefit the businesses in future years.

   *  *  *  *  *  *  *

CAPITALIZATION AND
INVESTMENT STRATEGY

Introduction

The disposition of Mosby Matthew Bender (MMB) will produce an unprecedented level of investible [sic] capital for Times Mirror.  Net proceeds of approximately $2.0 billion will be deposited into our accounts requiring immediate rigorous management.

The net proceeds of the MMB disposition, in conjunction with our annual operating cash flow will provide the company with enormous investment capacity over the next few years.  If we can successfully deploy this investment capacity in assets that meet our return criteria, our total 5 year investment capacity would be as much as $5 billion.  Investment at this level would still enable us to retain our current solid credit ratings and associated financial flexibility.

Our first responsibility upon receipt of the disposition proceeds is to establish a short term

portfolio management framework.  The primary objective of this activity is to preserve principal value while earning a return commensurate with the risk parameters we establish through our investment policy.

Second, we will begin to redeploy these resources into operating assets to drive revenue growth and into share repurchases to start to return towards our target capitalization.  In the current high asset valuation environment, in view of our well developed return discipline, this program could require several years.

Most significantly, we are not looking at our resources as a war chest for a big cash acquisition.  Instead, we are expecting increases of approximately 25%, a doubling of our recent spending rate on acquisitions of businesses that are closely related to or fill in gaps in our core businesses, acceleration of our share repurchase plans and, in general, an acceleration of investments in our base businesses.

This stance leaves us with ample resources for pursuing unexpected opportunities and will position us to try to "make things happen" as important strategic initiatives are identified.  It also means that we will allocate a portion of our surplus cash investment portfolio to investments with medium term horizons in order to increase the overall return on our cash.  Examples of this type of investing include the investment we made in Target Media Partners in connection with the Recycler purchase, and the Latin Communications Group opportunity we discussed at the last meeting, as well as increases in "new media" venture capital investments.  We will also allocate a portion of the funds for tax-advantaged investments to enhance yield and for "pre-funding" our charitable commitments with contributions to our tax-exempt affiliates.

*     *     *     *     *     *     *

Short Term Portfolio Strategy

The following shows the gross amount of disposition proceeds the company will be receiving:

($ Millions)

| Company Sold | Entity Receiving Funds | Amount (Gross) |
|---|---|---|
| Shepards | Corporate | $275 |
| Bender | Liberty Bell I L.L.C. | 1,375 |
| Mosby | Liberty Bell II L.L.C. | 415 |
| | Total: | $2,065 |

Immediately we will utilize the funds to pay necessary transaction expenses, pay down short-term corporate debt, and then invest the remaining funds under our short-term investment policy * * *.  This policy ensures preservation of capital and maintenance of liquidity through prudent standards for credit quality, instrument type and overall portfolio limitations.  At the same time, it provides for sufficient flexibility to allow us to search for yield advantages where possible.  The following table shows the net investible [sic] funds that should be available to deploy in short-term instruments:

($ Millions)

| Funds Location | Gross Funds | Estimated Cash Transaction Fees and Expenses | Short-Term Debt Reduction | Net Funds |
|---|---|---|---|---|
| Corporate | $275 | -- | ($275) | $0 |
| Liberty Bell I | 1,375 | (64) | -- | 1,311 |
| Liberty Bell II | 415 | (22) | -- | 393 |
| | | | Total: | $1,704 |

W.    Execution of the LBI Limited Liability Company Agreement (the management authority)

On July 28, 1998, representatives of Times Mirror, Lexis, and MB Parent executed an agreement entitled "Limited Liability Company Agreement of Liberty Bell I, LLC" (LBI LLC agreement). The terms of the LBI LLC agreement included the following:

This Limited Liability Company Agreement (together with the schedules attached hereto, this

"Agreement") of LIBERTY BELL I, LLC (the "Company"), is entered into by CBM ACQUISITION PARENT CO., a Delaware corporation, as the sole member (the "Initial Member"), LEXIS, INC., a Delaware corporation, as the initial manager of the Company (the "Initial Manager"), and THE TIMES MIRROR COMPANY, in its corporate capacity and as the manager of the Company appointed pursuant to Section 9(b) ("TMC").  * * *

The Initial Member, the Initial Manager and TMC, by execution of this Agreement, hereby agree as follows:

1.  <u>Name; Formation; Tax Treatment</u>.

The name of the limited liability company shall be LIBERTY BELL I, LLC or such other name as the Manager may from time to time hereafter designate. * * *  The parties hereto intend that pursuant to Treasury Regulations Sections 301.7701-3, the Company be disregarded as an entity and not be treated as separate from the Initial Member.  * * *

*    *    *    *    *    *    *

5.  <u>Members; Member Rights; Meetings</u>.

*    *    *    *    *    *    *

c.  No Member shall have any right, power, or duty, including the right to approve or vote on any matter (including, without limitation, any vote, approval or consent relating to the merger of the Company with or into an "other business entity" (as defined in the Act), the consolidation of the Company with or into an other business entity, the domestication of the Company to an other business entity, the conversion of the Company to an other business entity, the transfer of the Company to any other jurisdiction or, to the fullest extent permitted by law, the dissolution of the Company), except as expressly required by this Agreement, the Act or other applicable law.

*    *    *    *    *    *    *

7. <u>Purposes</u>.

The purpose of the Company is to invest in such property or securities and to conduct such businesses and other legal activities as the Manager determines is in the best interests of the Company.

\*   \*   \*   \*   \*   \*   \*

9. <u>Management</u>.

a.   The Manager shall have the sole right to manage the business of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company, and no Member or other person other than the Manager shall have any authority to act for or bind the Company or to vote on or approve any of the actions to be taken by the Company (unless otherwise expressly required by the Act or other applicable law). Notwithstanding the foregoing, the Initial Manager shall not take any action in respect of or on behalf of the Company, other than the opening of one or more bank accounts in the name of the Company, the appointment of an agent for service of process for the Company and the performance of other ministerial duties in connection with the organization and formation of the Company. Accordingly, as of the Effective Time of the Merger, the Company shall have no liabilities or obligations other than pursuant to this Agreement.

b.   The Manager shall serve until an Event of Withdrawal has occurred [the resignation or dissolution of the Manager]. The removal of the Manager shall be only at the request and direction of the Manager and under no other circumstances, including, without limitation, for cause. Upon any such Event of Withdrawal, a new Manager shall be selected by the old Manager prior to such resignation or dissolution, provided that if the Manager does not make such selection, Members holding a Majority in Interest shall be entitled to select a new Manager. Notwithstanding anything contained herein, immediately after the Effective Time of the Merger and without any action on the part of TMC, the Initial Manager or any Member, the Initial Manager (or any other Manager, if applicable) shall be automatically removed as Manager and TMC shall become the Manager hereunder.

c.  The Manager may appoint the Officers of the Company, who need not be Members, to such terms and to perform such functions as the Manager shall determine in its sole discretion as set forth in Section 10.  The Manager may appoint, employ or otherwise contract with such other persons or entities for the transaction of the business of the Company or the performance of services for or on behalf of the Company as it shall determine in its sole discretion. The Manager may delegate to any such Officer, person or entity such authority to act on behalf of the Company as the Manager may from time to time deem appropriate in its sole discretion.

 *    *    *    *    *    *    *

e.  Without limiting the generality of the foregoing, to the fullest extent permitted by law, including Section 18-1101(c) of the Act, and without creating any duties or obligations of the Manager by implication or otherwise, it is expressly acknowledged and agreed that to the extent the Manager owes any fiduciary duties or similar obligations to the Initial Member under any principles of law or equity or otherwise, such duties and obligations shall be owed solely to the holders of the Initial Member's common equity and not to the holders of any other class of the Initial Member's equity.

 *    *    *    *    *    *    *

10.  <u>Officers</u>.

a. <u>Officers</u>.  The Officers of the Company shall be chosen by the Manager and shall consist of at least a President, a Secretary and a Treasurer.  * * * The Manager may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager.  The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Manager.  * * *  Any Officer elected or appointed by the Manager may be removed at any time, with or without cause, by the Manager.  Any vacancy occurring in any office of the Company shall be filled by the Manager.

*    *    *    *    *    *    *

11.  <u>Books and Records</u>.

a.  The Manager shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The Company's books of account shall be kept using the method of accounting determined by the Manager.  The Company's independent auditor shall be an independent public accounting firm selected by the Manager.  The Manager shall give each Member reasonable access during normal business hours to the books and records of the Company.

*    *    *    *    *    *    *

12.  <u>Capital Contributions</u>.

The Initial Member was deemed admitted as the sole Member of the Company upon the execution and delivery of this Agreement.  After the Effective Time of the Merger and immediately after TMC shall have been appointed Manager pursuant to Section 9(b), the Initial Member will contribute the amount of cash to the Company listed on <u>Schedule B</u> attached hereto [$1.375 billion].

*    *    *    *    *    *    *

15.  <u>Distributions</u>.

Distributions of cash or other assets of the Company shall be made at such times and in such amounts as the Manager may determine in its sole discretion; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Initial Member shall be entitled to receive, and the Company and the Manager shall make, distributions of cash (or other assets of the Company acceptable to the Member) to the Initial Member in the amounts and at the times sufficient to enable the Initial Member (a) to pay all of its liabilities, obligations and expenses as and when they come due and (b) to make any payments on, or distributions in respect of, the issued and outstanding shares of the Voting Preferred Stock of the Initial Member in accordance with the terms thereof.  * * *

16.  <u>Return of Capital</u>.

The Manager shall not have any liability for the return of each Member's capital contribution, which return shall be payable solely from the assets of the Company at the absolute discretion of the Manager, subject to the requirements of the Act and Section 15 hereof.

\*      \*      \*      \*      \*      \*      \*

18.  <u>Exculpation and Indemnification</u>.

a.  No Member, Manager, Officer, employee or agent of the Company and no employee, representative, agent, shareholder or Affiliate of the Member or the Manager (collectively, the "Covered Persons") shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.  Notwithstanding anything herein to the contrary, "Covered Person" shall include any person that was a Member, Manager, Officer, employee or agent of the Company or an employee, representative, agent, shareholder or Affiliate of the Member or the Manager at the time the act or omission described in this Section 18(a) was performed or omitted even if such person is no longer a Member, Manager, Officer, employee or agent of the Company or an employee, representative, agent, shareholder or Affiliate of a Member or the Manager at the time the loss, damage or claim is incurred as a result of such act or omission.

\*      \*      \*      \*      \*      \*      \*

e.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith

reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member and the Manager to replace such other duties and liabilities of such Covered Person.

f. The foregoing provisions of this Section 18 shall survive any termination of this Agreement.

19. <u>Resignation</u>.

No Member shall have the right to resign from the Company except with the consent of the Manager and upon such terms and conditions as may be specifically agreed upon between the Manager and the resigning Member.

\* \* \* \* \* \* \*

21. <u>Dissolution</u>.

Subject to the provisions of Section 22 of this Agreement, the Company shall be dissolved and its affairs wound up upon the first to occur of the following:

a. The determination of the Manager to dissolve the Company;

b. The occurrence of an Event of Withdrawal;

c. The occurrence of any event which terminates the membership of the last remaining Member of the Company unless the business of the Company is continued in a manner permitted by the Act including, without limitation, the appointment by the Manager of a member of this Company within ninety (90) days after the occurrence of such an event; or

d. The entry of a decree of judicial dissolution under Section 18-802 of the Act.

\* \* \* \* \* \* \*

23. <u>Assignments of Percentage Interest</u>.

No Member may, directly or indirectly, sell, assign, pledge or otherwise transfer or encumber any portion of such Member's Percentage Interest (a "<u>Transfer</u>") to any other person without the prior written consent of the Manager, which may be given or withheld in its sole discretion and which consent may be subject to such terms and conditions as the Manager may determine. Any purported Transfer in violation of Section 23 shall be null and void and shall not be recognized by the Company.

24. <u>Waiver of Partition; Nature of Interest</u>.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company. The interest of each Member in the Company is personal property.

\*   \*   \*   \*   \*   \*   \*

29. <u>Amendments</u>.

This Agreement may be amended by the Manager at any time in its sole discretion, <u>provided</u> <u>that</u> (a) any amendment to Section 9(d), Section 11, the first sentence of Section 13, Section 14, the proviso to the first sentence of Section 15, Section 17, Section 18, Section 20, Section 24, this Section 29 or Section 34 hereof shall not be effective without the Initial Member's prior written consent, which consent shall not be unreasonably withheld and (b) any amendment which materially and adversely affects the rights of any Member shall not be effective without such Member's consent, such consent not to be unreasonably withheld; <u>provided</u> <u>further</u> that, in addition to any consent or approval otherwise required

under this Section 29 or applicable law, any amendment which materially and adversely affects the rights of all the Members in the same or similar manner shall only be effective if such amendment has been approved by Members holding a Majority in Interest, such approval not to be unreasonably withheld; and provided further that any amendment to Section 9 must be approved by TMC in its sole discretion.

\*   \*   \*   \*   \*   \*   \*

33.  Enforceability by TMC.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member by TMC (both in its corporate capacity, prior to the Effective Time of the Merger, and in its capacity, as of immediately after the Effective Time of the Merger, as the Manager of the Company), in accordance with its terms.  In addition, TMC (both in its corporate capacity, prior to the Effective Time of the Merger, and in its capacity, as of immediately after the Effective Time of the Merger, as the Manager of the Company) is an intended beneficiary of this Agreement.

X.  Execution of MB Parent Stockholders Agreement and the MergerSub Shareholders Agreement

On July 28, 1998, representatives of Times Mirror, TMD, REUS, REBV, and MB Parent executed an agreement entitled "CBM Acquisition Parent Co. Stockholders Agreement" (MB Parent stockholders agreement).  Under the terms of the MB Parent stockholders agreement, Times Mirror, TMD, REUS, REBV, and MB Parent agreed, in pertinent part, to the following:

Section 1.  Call Option with Respect to Voting Preferred Stock.

(a) Grant of Call Option.  Acquirors [REUS and REBV] hereby grant to TMD an option, exercisable by TMD no earlier than fifteen (15) days after the occurrence

of any Call Event (as defined below), to purchase, in the manner provided in Section 1(d), all, but not less than all, of the outstanding shares of [MB Parent] Voting Preferred Stock, at a purchase price per share equal to 100% of the Stated Value thereof on the date of purchase, payable in cash.

(b) <u>Definition of Call Event</u>.  A "<u>Call Event</u>" shall mean (i) June 30, 2018, (ii) any voluntary transfer or other disposition by the Company [MB Parent] of all or any portion of the shares of MergerSub Participating Preferred Stock or (iii) any voluntary transfer or other disposition by the Company of all or any portion of the shares of MergerSub Voting Preferred Stock.

(c) <u>Call Option Subject to the Company's Right of Redemption</u>.  Notwithstanding the foregoing, the right of TMD to exercise the option granted pursuant to Section 1(a) shall be subject to the Company's right to redeem the Voting Preferred Stock pursuant to Section 3(g)(i) of Article V of the Restated Certificate of Incorporation of the Company upon the occurrence of a Redemption Event (as defined therein) and to the Company's obligation to redeem the Voting Preferred Stock of a holder of Voting Preferred Stock at the option of such holder pursuant to Section 3(g)(ii) of Article V of the Restated Certificate of Incorporation of the Company upon the occurrence of an event specified therein.

*     *     *     *     *     *     *

Section 2.  Put Option with Respect to Voting Preferred Stock.

(a) <u>Grant of Put Option</u>.  TMD hereby grants to each Acquiror an option, exercisable after (i) June 30, 2018 or (ii) upon the occurrence of any failure of Liberty Bell I, LLC (or a successor thereof) or its manager to make distributions contemplated by Section 15 of the Limited Liability Company Agreement of Liberty Bell I, LLC, dated as of July 28, 1998 * * *, to require TMD to purchase, in the manner provided in Section 2(b), the shares of the [MB Parent] Voting Preferred Stock held by each Acquiror, at a purchase price per share equal to 100% of the Stated Value thereof on the date of purchase, payable in cash.

Section 3.  Restrictions on Transfer.

(a) <u>General</u>.  No holder of shares of [MB Parent] Voting Preferred Stock shall, directly or indirectly, transfer or otherwise dispose of any shares of [MB Parent] Voting Preferred Stock owned by such holder or any interest therein prior to June 30, 2000. * * *

Also on July 28, 1998, representatives of REUS, REBV, MB Parent, and MergerSub executed an agreement entitled "CBM MergerSub Corp. Shareholders Agreement" (MergerSub shareholders agreement).  Under the terms of the MergerSub shareholders agreement, REUS, REBV, MB Parent, and MergerSub agreed, in pertinent part, to the following:

Section 1.  Call Option with Respect to Voting Preferred Stock.

(a) <u>Grant of Call Option</u>.  MB Parent hereby grants to Acquirors [REUS and REBV] an option, exercisable by Acquirors on or after July 15, 2018, to purchase, in the manner provided in Section 1(c), all, but not less than all, of the outstanding shares of [MergerSub] Voting Preferred Stock, at a purchase price per share equal to 100% of the Stated Value thereof on the date of purchase.

(b) Call Option Subject to the Company's Right of Redemption.  Notwithstanding the foregoing, the right of Acquirors to exercise the option granted pursuant to Section 1(a) shall be subject to the Company's [MergerSub's] right or obligation, as the case may be, to redeem the Voting Preferred Stock pursuant to Section 4(g)(i) of Article V of the Restated Certificate of Incorporation of the Company upon the occurrence of an event specified therein and the Company's obligation to redeem the Voting Preferred Stock of a holder of Voting Preferred Stock at the option of such holder pursuant to Section 4(g)(ii) of Article V of the Restated Certificate of Incorporation of the Company upon the occurrence of an event specified therein.

\* \* \* \* \* \* \*

Section 2.  Put Option with Respect to Voting Preferred Stock.

(a) <u>Grant of Put Option</u>.  Acquiror[s] hereby grants [sic] to MB Parent an option, exercisable after June 30, 2018, to require Acquirors to purchase, in the manner provided in Section 2(b), all, but not less than all, of the outstanding shares of the [MergerSub] Voting Preferred Stock, at a purchase price per share equal to 100% of the Stated Value thereof on the date of purchase.

\* \* \* \* \* \* \*

Section 3.  Call Option with Respect to Participating Preferred Stock.

(a) <u>Grant of Call Option</u>.  MB Parent hereby grants to Acquirors an option, exercisable by Acquirors on or after July 15, 2018, to purchase, in the manner provided in Section 3(c), all, but not less than all, of the outstanding shares of [MergerSub] Participating Preferred Stock, at a purchase price per share equal to the dollar amount derived from the EBITDA Formula (as defined in Section 3(g)(i)(B) of Article V of the Restated Certificate of Incorporation of the Company).

(b) <u>Call Option Subject to the Company's Right of Redemption</u>.  Notwithstanding the foregoing, the right of Acquirors to exercise the option granted pursuant to Section 3(a) shall be subject to the Company's right to redeem the Participating Preferred Stock pursuant to Section 3(g)(i) of Article V of the Restated Certificate of Incorporation of the Company upon the occurrence of an event specified therein and the Company's obligation to redeem the Participating Preferred Stock pursuant to Section 3(g)(ii) of Article V of the Restated Certificate of Incorporation of the Company upon the occurrence of an event specified therein.

\* \* \* \* \* \* \*

Section 4.  Put Option with Respect to Participating Preferred Stock.

(a) <u>Grant of Put Option</u>.  Acquirors hereby grant to MB Parent an option, exercisable after June 30, 2018, to require Acquirors to purchase, in the manner provided in Section 2(b), all, but not less than all, of the outstanding shares of the [MergerSub] Participating Preferred Stock, at a purchase price per share equal to the dollar amount derived from the EBITDA Formula.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Section 5.  Certain Additional Call Options.

(a) <u>Grant of Call Option</u>.  MB Parent hereby grants to Acquirors an option, exercisable by Acquirors upon the occurrence of a Call Event (as defined * * * below) to purchase in the manner provided in Section 5(c), all, but not less than all, of either or both of (i) the shares of [MergerSub] Voting Preferred Stock, at a purchase price per share equal to 100% of the Stated Value thereof on the date of purchase and (ii) the shares of [MergerSub] Participating Preferred Stock, at a purchase price per share equal to the dollar amount derived from the EBITDA Formula.

(b) <u>Definition of Call Event</u>.  For purposes of Section 5, a "<u>Call Event</u>" shall mean (i) that the Net Worth of Liberty Bell I, LLC is less than $275 million, (ii) the insolvency, liquidation, bankruptcy, or any similar event, of MB Parent, (iii) any threatened or actual involuntary transfer or disposition by MB Parent of any shares of Participating Preferred Stock, (iv) any threatened or actual involuntary transfer or disposition by MB Parent of any shares of Voting Preferred Stock or (v) any failure of Liberty Bell I, LLC (or a successor thereof) or its manager to make distributions contemplated by Section 15 of the Limited Liability Company Agreement of Liberty Bell I, LLC dated as of July 28, 1998 * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Section 6.  Drag-Along Rights.

(a) <u>The Drag-Along Right</u>.  After June 30, 2003, if Acquirors (together with any of their successors, transferees and assigns, the "<u>Selling Shareholders</u>") propose to sell all of the shares of [MergerSub] Common

Stock to a single person or to any group of related persons (the "Prospective Purchaser"), then such Selling Shareholders shall have the right (the "Drag-Along Right") to compel MB Parent (together with its successors, transferees and assigns, the "Drag-Along Shareholders") to sell all of the shares of [MergerSub] Participating Preferred Stock and [MergerSub] Voting Preferred Stock owned by them to the Prospective Purchaser at, in the case of Voting Preferred Stock, a price per share equal to 100% of the Stated Value of the Voting Preferred Stock on the date of purchase and, in the case of the Participating Preferred Stock, a price per share equal to the dollar amount derived from the EBITDA Formula, and otherwise on the same terms and subject to the same conditions, as the Selling Shareholders are able to obtain with respect to the Common Stock.   * * *

* * * * * * *

Section 7.  Restrictions on Transfer.

(a) General.  Except as otherwise permitted or required hereby, no holder of shares of Voting Preferred Stock shall, directly or indirectly, transfer or otherwise dispose of any shares of Voting Preferred Stock owned by such holder or any interest therein prior to June 30, 2003.  Except as otherwise permitted or required hereby, no holder of shares of Participating Preferred Stock shall, directly or indirectly, transfer or otherwise dispose of any shares of Participating Preferred Stock owned by such holder, or any interest therein prior to June 30, 2003.  * * *

Y.  Filing of the Restated Certificates of Incorporation for MB Parent and MergerSub

On July 29, 1998, a restated certificate of incorporation for MB Parent was filed with the Secretary of State of the State of Delaware.  The restated certificate of incorporation for MB Parent established five directors, of whom three would constitute a quorum, and included the following provisions:

ARTICLE V

AUTHORIZED CAPITAL STOCK

Section 1.  Authorized Shares.

The total number of shares of all classes of capital stock which the corporation shall have the authority to issue is Five Thousand (5,000) shares, of which (1) One Thousand (1,000) shares, having a par value of $.01 per share, shall be Common Stock ("Common Stock") and (ii) Four Thousand (4,000) shares, having a par value of $.01 per share, shall be Voting Preferred Stock ("Voting Preferred Stock").

Section 2.  Common Stock.

*    *    *    *    *    *    *

(b) Voting Rights.

(i) Voting Power.  Except as otherwise provided in Section (3)(i)(ii) of this Article V, the holders of shares of Common Stock shall be entitled to vote on all matters presented to the stockholders of the corporation.  Except as otherwise provided herein or required by law, the holders of Common Stock shall vote together with the holders of shares of Voting Preferred Stock.  Each share of Common Stock shall be entitled to one (1) vote per share.

(ii) Voting Rights with Respect to Election or Removal of Directors.  The holders of shares of Common Stock shall be entitled, voting as a separate class, to elect one (1) director of the corporation (the "Common Stock Director").  The Common Stock Director shall be removed only by a vote of the holders of a majority of the shares of Common Stock, voting as a separate class.

Section 3.  Voting Preferred Stock.

*    *    *    *    *    *    *

(b) Issuance and Stated Value.  The shares of Voting Preferred Stock shall be issued by the corporation for their Stated Value (as defined below), in such amounts, at such times and to such persons as

shall be specified by the corporation's Board of Directors, from time to time.  For the purposes hereof, the "Stated Value" of each share of Voting Preferred Stock (regardless of its par value) shall be $17,187.50 per share plus the Unpaid Dividend Amount (as defined below), which Stated Value shall be proportionately increased or decreased for any subdivision, combination, reclassification or stock split, respectively, of the outstanding shares of Voting Preferred Stock.  For the purposes hereof, the "Unpaid Dividend Amount" with respect to each share of the Voting Preferred Stock shall be equal to the aggregate of all Quarterly Dividends (as defined below) that the holder of such share shall have theretofore become entitled to receive for such share but that shall not have been declared and paid by the Board of Directors of the corporation.

(c) Rank.  The Voting Preferred Stock shall, with respect to dividend rights and rights on liquidation, winding up and dissolution, rank (i) senior to the Common Stock and all other classes or series of stock of the corporation now or hereafter authorized, issued or outstanding that by their terms expressly provide that they are junior to the Voting Preferred Stock or which do not specify their rank with respect to the Voting Preferred Stock (collectively with the Common Stock, "Junior Securities") and (ii) on a parity with all classes or series of stock of the corporation now or hereafter authorized, issued or outstanding that by their terms expressly provide that they will rank on parity with the Voting Preferred Stock as to dividend distributions and distributions upon liquidation, winding up and dissolution of the corporation (collectively, "Parity Securities").

(d) Dividends.

(i) Amount of Dividends.  On the last business day of each March, June, September and December in each calendar year (the "Dividend Accrual Date"), each holder of record as of the close of business on the Dividend Accrual Date of shares of the Voting Preferred Stock as their names appear in the stock register of the corporation on such date shall become entitled to receive (when, as and if declared by the Board of Directors of the corporation) a dividend (the "Quarterly Dividend") equal to one and three

hundred seventy-five thousands percent (1.375%) of the Stated Value of such share (pro-rated for any portion of the full calendar quarter that such share shall have been issued and outstanding).

* * * * * * *

(e) <u>Restrictions on Junior Payments</u>. So long as any shares of Voting Preferred Stock are outstanding, the corporation shall not (i) declare, pay or set apart for payment any dividend on, or make any distribution in respect of, Junior Securities or any warrants, rights, calls or options exercisable or convertible into any Junior Securities, either directly or indirectly, whether in cash, obligations or shares of the corporation or other property * * *, (ii) make any payment on account of, or set apart for payment money for a sinking or other similar fund for, the purchase, redemption, retirement or other acquisition for value of any of, or redeem, purchase, retire or otherwise acquire for value any of, the Junior Securities * * * or any warrants, rights, calls or options exercisable for or convertible into any of the Junior Securities, or (iii) permit any corporation or other entity directly or indirectly controlled by the corporation to purchase, redeem, retire, or otherwise acquire for value any of the Junior Securities or any warrants, rights, calls or options exercisable for or convertible into any Junior Securities.

(f) <u>Liquidation Preference</u>.

(i) <u>Liquidation Preference</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the corporation, the holders of shares of Voting Preferred Stock then outstanding shall be entitled to be paid out of the assets of the corporation available for distribution to its stockholders, whether such assets are capital or surplus and whether or not any Quarterly Dividends are declared, an amount equal to the Stated Value for each share outstanding on the date fixed for liquidation, dissolution or winding up (the "Liquidation Preference"), before any payment shall be made or any assets distributed to the holders of Junior Securities. * * *

* * * * * * *

(g) <u>Redemption</u>.

    (i) <u>Redemption by the Corporation</u>.

    (A) The corporation may, at its option upon or after the occurrence of any Redemption Event (as defined below), redeem, out of funds legally available therefor, in the manner provided in Section 3(g)(ii)(A) of this Article V, all, but not less than all, of the shares of Voting Preferred Stock, at a redemption price equal to 100% of the Stated Value thereof on the date of redemption payable in cash.

    (B) For purposes of this Section 3(g)(i), a "Redemption Event" shall mean (x) June 30, 2018, (y) any transfer or other disposition by the corporation of shares of Participating Preferred Stock, par value $.01 per share, of CBM MergerSub Corp., a New York corporation (hereinafter "CBM MergerSub Corp.") [MergerSub], or the comparable securities of any successor corporation to CBM MergerSub Corp. (the "MergerSub Participating Preferred Stock") or (z) any transfer or other disposition by the corporation of shares of Voting Preferred Stock, par value $.01 per share, of CBM MergerSub Corp. or the comparable securities of any successor corporation to CBM MergerSub Corp. (the "MergerSub Voting Preferred Stock").

    (ii) <u>Redemption at Option of Holders</u>. (i) After June 30, 2018 or (ii) upon the occurrence of any failure of Liberty Bell I, LLC (or a successor thereof) or its manager to make distributions contemplated by Section 15 of the Limited Liability Company Agreement of Liberty Bell I, LLC dated as of July 28, 1998 * * *, any holder of shares of Voting Preferred Stock shall be entitled at its option, to require the corporation to redeem, out of funds legally available therefor, in the manner provided in Section 3(g)(iii)(B) of this Article V, all of the shares of the Voting Preferred Stock held by such holder, at a redemption price per share equal to 100% of the Stated Value thereof on the date of redemption payable in cash.

    *     *     *     *     *     *     *

(i) <u>Voting Rights</u>.

(i) <u>Voting Power</u>.  Except as otherwise provided in Section 2(b)(ii) of this Article V or as required by law, the holders of Voting Preferred Stock shall be entitled to vote on all matters presented to the stockholders of the corporation.  Except as otherwise provided herein or required by law, the holders of Voting Preferred Stock shall vote together with the holders of shares of Common Stock.  Each share of Voting Preferred Stock shall be entitled to one (1) vote per share.

(ii) <u>Voting Rights with Respect to Election of Directors</u>.  The holders of shares of Voting Preferred Stock shall be entitled, voting as a separate class, to elect four (4) directors of the corporation (the "Preferred Stock Directors").  A Preferred Stock Director shall be removed only by the vote of the holders of a majority of the shares of Voting Preferred Stock, voting as a separate class.

*     *     *     *     *     *     *

(j) <u>Transfer Restrictions</u>.

(i) <u>General</u>.  No holder of shares of Voting Preferred Stock shall, directly or indirectly, transfer or otherwise dispose of any shares of Voting Preferred Stock owned by such holder, or any interest therein prior to June 30, 2000.  * * *

*     *     *     *     *     *     *

ARTICLE VI

POWERS OF THE BOARD OF DIRECTORS

Except as otherwise provided by law, the Board of Directors is expressly authorized and empowered by majority vote to determine all matters relating to the business and management of the corporation; <u>provided</u>, <u>however</u>, the following actions shall be taken by the corporation only upon the unanimous vote of the Board of Directors including, in each case, the Common Stock Director:  (a) the incurrence of indebtedness or any other similar obligation, including in the form of any guaranty of the indebtedness of another person; (b) the

sale, transfer or other disposition, pledge, encumbering or assignment by the corporation of all or any portion of its limited liability company interest in Liberty Bell I, LLC; (c) the amendment of this Restated Certificate of Incorporation; (d) the issuance by the corporation of any shares of capital stock, or any other securities or options or warrants to purchase any shares of capital stock or other securities; (e) the declaration of any dividends with respect to the Common Stock; (f) the sale or redemption of the shares of MergerSub Participating Preferred Stock held by the corporation prior to June 30, 2003 other than in accordance with the terms thereof or of the CBM MergerSub Corp. Shareholders Agreement among CBM MergerSub Corp., Reed Elsevier U.S. Holdings Inc., Reed Elsevier Overseas BV and the corporation dated as of July 28, 1998 * * * (the "MergerSub Shareholders Agreement"); (g) the sale or redemption of the shares of MergerSub Voting Preferred Stock held by the corporation prior to June 30, 2003 other than in accordance with the terms of the Shareholder Agreement; (h) the approval by the Board of Directors of any action taken by the corporation with respect to any shareholder resolution relating to a change in the Restated Certificate of Incorporation of CBM MergerSub Corp. or any successor entity, or a modification of the terms of the MergerSub Participating Preferred Stock or the MergerSub Voting Preferred Stock, except for an increase in the authorized shares of Common Stock of CBM MergerSub Corp., (i) the approval by the Board of Directors of any action taken by the corporation with respect to any shareholder resolution relating to the liquidation or dissolution of CBM MergerSub Corp. or any successor corporation, the merger into or consolidation with another entity of CBM MergerSub Corp. or any successor corporation unless the certificate of incorporation of the surviving corporation in such merger or consolidation is the Restated Certificate of Incorporation of Matthew Bender & Company, Incorporated, immediately after giving effect to the merger of CBM MergerSub Corp. with and into Matthew Bender & Company, Incorporated, without any amendment or restatement; (j) the amendment of the Stockholders Agreement or (k) the amendment of the MergerSub Shareholders Agreement.

(On August 6, 1998, a certificate of correction was filed with the secretary of state of the State of Delaware with respect to MB Parent's restated certificate of incorporation.  The minor corrections that were made to MB Parent's restated certificate of incorporation as a result of this filing are reflected in the preceding excerpt.)

Also on July 29, 1998, a restated certificate of incorporation for MergerSub was filed with the Department of State of the State of New York.  The restated certificate of incorporation for MergerSub established five directors, of whom three would constitute a quorum, and included the following provisions:

ARTICLE V

AUTHORIZED CAPITAL STOCK

Section 1.  Authorized Shares.

The total number of shares of all classes of capital stock which the corporation shall have authority to issue is Twenty-Three Thousand Nine Hundred Seventy (23,970) shares, of which (i) Twenty Thousand (20,000) shares, having a par value of $.01 per share, shall be Common Stock ("Common Stock") having the rights, preferences and privileges set forth in Section 2 of this Article V, (ii) Ten (10) shares, having a par value of $.01 per share, shall be Nonvoting Participating Preferred Stock ("Participating Preferred Stock") having the rights, preferences and privileges set forth in Section 3 of this Article V and (iii) Three Thousand Nine Hundred Sixty (3,960) shares, having a par value of $.01 per share, shall be Voting Preferred Stock ("Voting Preferred Stock" and, together with the Participating Preferred Stock, "Preferred Stock") having the rights, preferences and privileges set forth in Section 4 of this Article V.

Section 2.  Common Stock.

\*      \*      \*      \*      \*      \*      \*

(i) <u>Voting Power</u>.  Except as otherwise provided in Sections 4(i)(ii) of this Article V, the holders of shares of Common Stock shall be entitled to vote on all matters presented to the shareholders of the corporation.  Except as otherwise provided herein or required by law, holders of shares of Common Stock shall vote together with holders of shares of Voting Preferred Stock.  Except as otherwise provided in Section 2(a)(ii), the shares of Common Stock shall represent, in the aggregate, twenty (20) votes and each share of Common Stock outstanding on the relevant record date shall have a vote equal to twenty (20) divided by the number of shares of Common Stock outstanding on such record date.

(ii) <u>Voting Rights with Respect to Election or Removal of Directors and Certain Other Matters</u>.  The holders of shares of Common Stock shall be entitled, voting as a separate class, to elect one (1) director of the corporation (the "Common Stock Director").  The Common Stock Director shall be removed only by the vote of the holders of a majority of the shares of Common Stock, voting as a separate class.  In voting for the election or removal of the Common Stock Director or in any other matter on which the Common Stock shall vote as a separate class, each share of Common Stock shall be entitled to one vote per share.

Section 3.  Participating Preferred Stock.

(a) <u>Issuance</u>.  The shares of Participating Preferred Stock shall be issued by the corporation for their par value, without stated value.

(b) <u>Rank</u>.  The Participating Preferred Stock shall, (i) with respect to rights with respect to the Quarterly Preferred Dividends (as defined below) and rights with respect to the Participating Preferred Liquidation Preference (as defined below) upon liquidation, winding up and dissolution, rank (x) senior to the Common Stock and all other classes or series of stock of the corporation now or hereafter authorized, issued or outstanding that by their terms expressly provide that they are junior to the

Participating Preferred Stock as to Quarterly Preferred Dividend distributions or as to the Participating Preferred Liquidation Preference upon liquidation, winding up or dissolution or which do not specify their rank with respect to the Participating Preferred Stock (collectively with the Common Stock, "Participating Junior Securities") and (y) on a parity with the Voting Preferred Stock and all other classes or series of stock of the corporation now or hereafter authorized, issued or outstanding that by their terms expressly provide that they will rank on parity with the Voting Preferred Stock as to the dividend distributions and distributions upon liquidation, winding up and dissolution of the corporation (collectively with the Voting Preferred Stock, "Preferred Parity Securities") and (ii) with respect to the Participating Dividends (as defined below) and all other rights with respect to distributions upon liquidation, winding up or dissolution, on a parity with the Common Stock.

(c) <u>Quarterly Preferred Dividends</u>.

(i) <u>Amount of Quarterly Preferred Dividends</u>. On the last business day of each March, June, September and December in each calendar year (the "Preferred Dividend Accrual Date"), each holder of record as of the close of business on the Preferred Dividend Accrual Date of shares of the Participating Preferred Stock as their names appear in the stock register of the corporation on such date shall become entitled to receive (when, as and if declared by the Board of Directors of the corporation) a dividend (the "Quarterly Preferred Dividend") equal to one cent ($.01) per share (pro-rated for any portion of a full calendar quarter that such share shall have been issued and outstanding).

\*     \*     \*     \*     \*     \*     \*

(d) <u>Restrictions on Participating Junior Payments</u>. So long as any shares of Participating Preferred Stock are outstanding, the corporation shall not (i) declare, pay or set apart for payment any dividend on, or make any distribution in respect of, Participating Junior Securities or any warrants, rights, calls or options exercisable or convertible into any Participating Junior Securities, either directly or indirectly, whether in cash, obligations or shares of the

corporation or other property * * *, (ii) make any payment on account of, or set apart for payment money for a sinking or other similar fund for, the purchase, redemption, retirement or other acquisition for value of any of, or redeem, purchase, retire or otherwise acquire for value any of, the Participating Junior Securities * * * or any warrants, rights, calls or options exercisable for or convertible into any of the Participating Junior Securities, or (iii) permit any corporation or other entity directly or indirectly controlled by the corporation to purchase, redeem, retire or otherwise acquire for value any of the Participating Junior Securities or any warrants, rights, calls or options exercisable for or convertible into any Participating Junior Securities, in each case, at any time when there is an Unpaid Preferred Dividend Amount.  For the purposes hereof, the "Unpaid Preferred Dividend Amount" with respect to each share of the Participating Preferred Stock shall be equal to the aggregate of all Quarterly Preferred Dividends that the holder of such share shall have theretofore become entitled to receive for such share but that shall not have been declared and paid by the Board of Directors of the corporation.

(e) Participating Dividends.  Each holder of record as of the close of business on the record date set therefor of shares of Participating Preferred Stock * * * shall become entitled to receive on a pro rata basis with the holders of shares of Common Stock any dividend (when, as and if declared by the Board of Directors of the corporation) with respect to the Common Stock (the "Participating Dividend").

(f) Participating Preferred Liquidation Preference.

(i) Participating Preferred Liquidation Preference.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the corporation, the holders of shares of Participating Preferred Stock then outstanding shall be entitled to be paid out of the assets of the corporation available for distribution to its shareholders, whether such assets are capital or surplus and whether or not any Quarterly Preferred Dividends are declared, an amount equal to the par value for each share outstanding on the date fixed for

liquidation, dissolution or winding up (the "Participating Preferred Liquidation Preference"), before any payment shall be made or any assets distributed to the holders of Participating Junior Securities.  * * *

(ii) <u>Additional Rights Upon Liquidation</u>.  In addition to the Participating Preferred Liquidation Preference, each holder of shares of Participating Preferred Stock will be entitled to participate on a pro rata basis with holders of shares of the Common Stock in any distribution of the assets of the corporation upon liquidation, winding up or dissolution.

*     *     *     *     *     *     *

(g) <u>Redemption</u>.

(i) <u>Redemption by the Corporation</u>.

(A) After (i) June 30, 2018, (ii) the insolvency, liquidation, bankruptcy or any similar event, of CBM Acquisition Parent Co. (hereinafter referred to as "MB Parent"), (iii) any threatened or actual involuntary transfer or disposition by MB Parent of any shares of Participating Preferred Stock, (iv) any threatened or actual involuntary transfer or disposition by MB Parent of any shares of Voting Preferred Stock or (v) any failure of Liberty Bell I, LLC (or a successor thereof) or its manager to make distributions contemplated by Section 15 of the Limited Liability Company Agreement of Liberty Bell I, LLC dated as of July __, 1998 * * * (each of the events described in clauses (ii) through (v), a "Trigger Event"), the corporation may, at its option, redeem, out of funds legally available therefor, in the manner provided in Section 3(g)(iii)(A) of Article V, all, but not less than all, of the shares of Participating Preferred Stock, at a redemption price per share, payable in cash, equal to the dollar amount derived from the EBITDA Formula (as defined below).

(B) "EBITDA Formula" means (x)(I) 8.5 multiplied by Trailing Four Quarter EBITDA less (II) Debt less (III) the aggregate Stated Value of the Voting Preferred Stock <u>multiplied</u> by (y).01 <u>divided</u> by

(z) the number of shares of Participating Preferred Stock then outstanding or, expressed algebraically

$$\frac{.01 \times (8.5 \times \text{Trailing Four Quarter EBITDA} - \text{Debt} - \text{Aggregate Stated Value of the Voting Preferred Stock})}{\text{number of shares of Participating Preferred Stock then outstanding}}$$

"Trailing Four Quarter EBITDA" means the sum of the earnings before interest, taxes, depreciation and amortization of the corporation as of the last day of each of the preceding four fiscal quarters of the corporation ended prior to the date of determination * * *. "Debt" means all indebtedness for borrowed money of the corporation * * *

(ii) <u>Redemption at Option of Holders</u>. After June 30, 2018, any holder of shares of Participating Preferred Stock <u>shall</u> be entitled, at its option, to require the corporation to redeem, out of funds legally available therefor, in the manner provided in Section 3(g)(iii)(B) of this Article V, all of the shares of the Participating Preferred Stock held by it, at a redemption price per share, payable in cash, equal to the dollar amount derived from the EBITDA Formula.

* * * * * * *

(i) <u>Voting Rights</u>. Except as specifically set forth in the NYBCL [the Business Corporation Law of the State of New York], the holders of shares of Participating Preferred Stock shall not be entitled to any voting rights with respect to any matters voted upon by shareholders of the corporation.

(j) <u>Restrictions on Transfer</u>.

(i) No holder of shares of Participating Preferred Stock shall, directly or indirectly, transfer or otherwise dispose of any shares of Participating Preferred Stock owned by such holder, or any interest therein prior to June 30, 2003. * * *

* * * * * * *

Section 4. Voting Preferred Stock.

* * * * * * *

(b) <u>Issuance and Stated Value</u>. The shares of Voting Preferred Stock shall be issued by the

corporation for their Stated Value (as defined below), in such amounts, at such times and to such persons as shall be specified by the corporation's Board of Directors, from time to time.  For the purposes hereof, the "Stated Value" of each share of Voting Preferred Stock (regardless of its par value) shall be $15,559.6369 per share plus the Unpaid Dividend Amount (as defined below), which Stated Value shall be proportionately increased or decreased for any subdivision, combination, reclassification, or stock split, respectively, of the outstanding shares of Voting Preferred Stock.  For the purposes hereof, the "Unpaid Dividend Amount" with respect to each share of Voting Preferred Stock shall be equal to the aggregate of all Quarterly Dividends (as defined below) that the holder of such share shall have theretofore become entitled to receive for such share but that shall not have been declared and paid by the Board of Directors of the corporation.

(c) Rank.  The Voting Preferred Stock shall, with respect to dividend rights and rights on liquidation, winding up and dissolution, rank (i) senior to the Common Stock, the Participating Preferred Stock with respect to the Participating Dividend rights of the Participating Preferred Stock, and all other classes or series of stock of the corporation now or hereafter authorized, issued or outstanding that by their terms expressly provide that they are junior to the Preferred Stock or which do not specify their rank with respect to the Voting Preferred Stock (collectively with the Common Stock, "Junior Securities") and (ii) on a parity with the Participating Preferred Stock with respect to the Preferred Dividend rights of the Participating Preferred Stock and all other classes or series of stock of the corporation now or hereafter authorized, issued or outstanding that by their terms expressly provide that they will rank on parity with the Voting Preferred Stock as to dividend distributions and distributions upon the liquidation, winding up and dissolution of the corporation (collectively, "Parity Securities").

(d) Quarterly Dividends.

(i) Amount of Quarterly Dividends.  On the last business day of each Preferred Dividend Accrual Date, each holder of record as of the close of business

on the Preferred Dividend Accrual Date of shares of the Voting Preferred Stock as their names appear in the stock register of the corporation on such date shall become entitled to receive (when, as and if declared by the Board of Directors of the corporation) a dividend (the "Quarterly Dividend") equal to one and one-quarter percent (1¼%) of the Stated Value of such share (pro-rated for any portion of a full calendar quarter that such share shall have been issued and outstanding).

*   *   *   *   *   *   *

(e) Restrictions on Junior Payments.  So long as any shares of Voting Preferred Stock are outstanding, the corporation shall not (i) declare, pay or set apart for payment any dividend on, or make any distribution in respect of, Junior Securities or any warrants, rights, calls or options exercisable or convertible into any Junior Securities, either directly or indirectly, whether in cash, obligations or shares of the corporation or other property * * * (ii) make any payment on account of, or set apart for payment money for a sinking or other similar fund for, the purchase, redemption, retirement or other acquisition for value of any of, or redeem, purchase, retire or otherwise acquire for value any of, the Junior Securities * * * or any warrants, rights, calls or options exercisable for or convertible into any of the Junior Securities, or (iii) permit any corporation or other entity directly or indirectly controlled by the corporation to purchase, redeem, retire or otherwise acquire for value any of the Junior Securities or any warrants, rights, calls or options exercisable for or convertible into any Junior Securities at any time when there is an Unpaid Dividend Amount with respect to the Voting Preferred Stock.  * * *

(f) Liquidation Preference.

(i) Liquidation Preference.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the corporation, the holders of shares of Voting Preferred Stock then outstanding shall be entitled to be paid out of the assets of the corporation available for distribution to its shareholders, whether such assets are capital or surplus and whether or not any Quarterly Dividends are declared, an amount equal to the Stated Value for each

share outstanding on the date fixed for liquidation, dissolution or winding up (the "Liquidation Preference"), before any payment shall be made or any assets distributed to the holders of Junior Securities. * * *

* * * * * * *

(g) Redemption.

(i) Redemption by the Corporation. After (A) June 30, 2018, the corporation may, at its option, in the manner provided in Section 4(g)(iii)(A), and (B) upon the occurrence of a Trigger Event, the corporation shall, in the manner provided in Section 4(g)(iii)(B) of this Article V, redeem, out of funds legally available therefor, all, but not less than all, of the shares of Voting Preferred Stock, at a redemption price per share equal to 100% of the Stated Value thereof on the date of redemption payable in cash.

(ii) Redemption at Option of Holders. After June 30, 2018, any holder of shares of Voting Preferred Stock shall be entitled, at its option, to require the corporation to redeem, out of funds legally available therefor, in the manner provided in Section 4(g)(iii)(C) of this Article V, the shares of the Preferred Stock held by it, at a redemption price per share equal to 100% of the Stated Value thereof on the date of redemption payable in cash.

* * * * * * *

(i) Voting Rights.

(i) Voting Power. Except as otherwise provided in Section 2(a)(ii) of this Article V or as required by law, the holders of Voting Preferred Stock shall be entitled to vote on all matters presented to the shareholders of the corporation. Except as otherwise provided herein or required by law, the holders of shares of Voting Preferred Stock shall vote together with the holders of shares of Common Stock. Except as otherwise provided in Section 4(i)(ii) and 4(i)(iii) of this Article V, the shares of Voting Preferred Stock shall represent, in the aggregate, eighty (80) votes * * *

(ii) <u>Voting Rights With Respect to Election or Removal of Directors and Certain Other Matters</u>. The holders of Voting Preferred Stock shall be entitled, voting as a separate class, to elect four (4) directors of the corporation (the "Preferred Stock Directors"). A Preferred Stock Director shall be removed only by the vote of the holders of a majority of the shares of Voting Preferred Stock, voting as a separate class. In voting for the election or removal of a Preferred Stock Director or in any other matter on which the Voting Preferred Stock shall vote as a separate class, each share of Voting Preferred Stock shall be entitled to one vote per share.

\*    \*    \*    \*    \*    \*    \*

(j) <u>Restrictions on Transfer</u>. No holder of shares of Voting Preferred Stock shall, directly or indirectly, transfer or otherwise dispose of any shares of Voting Preferred Stock owned by such holder, or any interest therein prior to June 30, 2003. \* \* \*

\*    \*    \*    \*    \*    \*    \*

ARTICLE X

RESTRICTIONS ON MERGERS, ETC.

The corporation may not be liquidated, dissolved, merged into or consolidated with another entity and no other entity may be merged into or consolidated with the corporation without the unanimous approval of all of the shareholders of the corporation entitled to vote.

ARTICLE XI

CERTAIN WAIVERS

The holders of the Preferred Stock hereby acknowledge and agree that their rights against the corporation, the directors of the corporation and holders of Common Stock are only those explicitly provided by this Restated Certificate of Incorporation or in any shareholders agreement executed among the shareholders of this corporation and to the extent that, at law or in equity, the corporation, the

directors of the corporation or holders of Common Stock would otherwise have any other duties (including fiduciary duties) or obligations to the holders of the Preferred Stock, either at law or in equity, such duties and obligations are waived.

## The Mechanics of the Bender Transaction

The mechanics of the Bender transaction are set forth below. All of the events described in this section occurred on July 31, 1998, in accordance with detailed instructions prepared by GD&C.

### A.  Capitalization of MergerSub and MB Parent

As the first step in the capitalization of MergerSub, MergerSub borrowed $600 million from the Luxembourg branch of Elsevier, S.A., an affiliate of Reed.  The Luxembourg branch of Elsevier, S.A., transferred the $600 million to a bank account that MergerSub maintained at Citibank (MergerSub Citibank account).

In addition to MergerSub's borrowing $600 million from the Luxembourg branch of Elsevier, S.A., REUS and REBV contributed $616,562,500 and $158,437,500, respectively, to MergerSub.  REUS and REBV transferred their respective contributions to MergerSub to the MergerSub Citibank account.

After making their respective contributions to MergerSub, REUS and REBV owned all of the issued and outstanding common stock of MergerSub, all of the voting preferred stock of MergerSub, and all of the participating preferred stock of MergerSub.

After the capitalization of MergerSub was completed, REUS and REBV contributed all of their shares of MergerSub voting preferred stock and MergerSub participating preferred stock to MB Parent in exchange for 100 percent of MB Parent voting preferred stock. As a class, the MB Parent voting preferred stock held by REUS and REBV was entitled to 80 percent of the voting power of MB Parent and had the power to elect four of the five directors of MB Parent.

In addition to REUS and REBV's contributions to MB Parent, MergerSub contributed $1.375 billion to MB Parent. In return, MB Parent issued 1,000 shares, i.e., all, of its common stock to MergerSub. The 1,000 shares of MB Parent common stock received by MergerSub were entitled to 20 percent of the voting power of MB Parent. As a class, the MB Parent common stock held by MergerSub had the power to elect one of the five directors of MB Parent. MergerSub transferred the $1.375 billion from the MergerSub Citibank account to a bank account that MB Parent maintained at Citibank (MB Parent Citibank account).

After the capitalization transactions described above had been completed, REUS, REBV, and MB Parent together owned all of the issued and outstanding common stock of MergerSub, all of the voting preferred stock of MergerSub, and all of the participating preferred stock of MergerSub. In addition, REUS, REBV, and MergerSub together owned all of the issued and outstanding common

stock of MB Parent and all of the voting preferred stock of MB Parent.

B.  Merger of MergerSub and Bender

After the capitalization transactions described above had been completed, MergerSub merged with and into Bender under the relevant provisions of the New York Business Corporation Law, with Bender continuing as the surviving corporation.  At the time that the merger of MergerSub with and into Bender became effective, all outstanding MergerSub stock was converted into Bender stock, in the same number of shares, in the same classes, and with the same voting power, rights, and qualifications as the previously issued MergerSub common stock, Mergersub voting preferred stock, and MergerSub participating preferred stock.

After the merger of MergerSub with and into Bender, REUS, REBV, and TMD held the following interests in MB Parent:

| MB Parent Stock | REUS | REBV | TMD |
| --- | --- | --- | --- |
| Common stock | | | |
| Shares owned | -- | -- | 1,000 |
| Percentage of class | -- | -- | 100% |
| Percentage of vote | -- | -- | 20% |
| | | | |
| Voting preferred stock | | | |
| Shares owned | 3,000 | 1,000 | -- |
| Percentage of class | 75% | 25% | -- |
| Percentage of vote | 60% | 20% | -- |

In addition, REUS, REBV, and MB Parent held the following interests in Bender:

| Bender Stock | REUS | REBV | MB Parent |
|---|---|---|---|
| Common stock | | | |
| Shares owned | 792 | 198 | -- |
| Percentage of class | 80% | 20% | -- |
| Percentage of vote | 16% | 4% | -- |
| | | | |
| Voting preferred stock | | | |
| Shares owned | -- | -- | 3,960 |
| Percentage of class | -- | -- | 100% |
| Percentage of vote | -- | -- | 80% |
| | | | |
| Participating preferred stock | | | |
| Shares owned | -- | -- | 10 |
| Percentage of class | -- | -- | 100% |
| Percentage of vote | -- | -- | -- |

C.  Capitalization of LBI (the LLC)

Pursuant to section 9.b. of the LBI LLC agreement, Times Mirror became the manager of LBI immediately following when the merger of MergerSub with and into Bender became effective.  As of that time, Lexis informed Mellon Trust and Bank of America that Times Mirror had replaced Lexis as manager of LBI and that they were to take instructions directly from Times Mirror on any administrative and operational aspects relating to LBI's bank accounts.

Immediately following Times Mirror's appointment as manager of LBI, MB Parent contributed $1.375 billion to LBI.  MB Parent transferred the $1.375 billion from the MB Parent Citibank account to a bank account that LBI maintained at Citibank (LBI Citibank account).  The $1.375 billion was then transferred from the LBI Citibank account to a bank account that LBI maintained at

Bank of America.  Times Mirror maintained its bank accounts at Bank of America as well.

D. <u>Closing</u>

The Bender transaction closed on July 31, 1998.  Times Mirror's sale of its 50-percent interest in Shepard's also closed on that date.

From the time that the Bender transaction closed to the time of trial of this case, Bender continued as a going concern in the legal publishing business.  The parties have agreed that the merger of MergerSub with and into Bender, with Bender as the surviving corporation, under the terms of the Bender agreement and in accordance with New York Business Corporation Law, satisfied the continuity of business enterprise requirement for qualification as a tax-free reorganization under section 368.

<u>Times Mirror's Management of LBI and the Development of Times Mirror's Investment Strategy Following the Closing of the Bender Transaction</u>

On July 31, 1998, the law firm of Richards, Layton & Finger (RL&F) prepared an opinion regarding LBI for Times Mirror, MB Parent, REUS, and REBV.  With respect to the LBI LLC agreement, RL&F was of the opinion that:

> 2.  The LLC Agreement constitutes a legal, valid and binding agreement of the Member [MB Parent] and Manager [Times Mirror], and is enforceable against the Member and the Manager, in accordance with its terms.
>
> 3.  If properly presented to a Delaware court, a Delaware court applying Delaware law, would conclude that (i) the removal of the Manager shall be only at

the request and direction of the Manager and under no other circumstances, including, without limitation, for cause, as provided for in Section 9(b) of the LLC Agreement and (ii) such provision, contained in Section 9(b) of the LLC Agreement, that requires the removal of the Manager to be only at the request and direction of the Manager, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member, in accordance with its terms.

On September 1, 1998, Times Mirror, acting in its capacity as manager of LBI, approved a purchase agreement into which LBI had entered with Merrill Lynch International on August 17, 1998 (LBI-MLI purchase agreement). Pursuant to the LBI-MLI purchase agreement, LBI agreed to purchase 1.5 million shares of Series A common stock of Times Mirror from Merrill Lynch International for an initial price of approximately $92 million.

On September 30, 1998, Times Mirror, acting in its capacity as manager of LBI, approved the change of LBI's name to Eagle New Media Investments, LLC (hereinafter referred to as the LLC).

A meeting of the officers of the LLC was convened on October 5, 1998. As of that date, the officers of the LLC were Unterman; Debra A. Gastler (Gastler), vice president of taxes for Times Mirror; Steven J. Schoch, vice president and treasurer of Times Mirror; William A. Niese (Niese); Kay D. Leyba; Anne M. Bacher; and Udovic. At this meeting, Unterman informed the other LLC officers of plans to invest the LLC's funds in shares of Series A common stock of Times Mirror and in three companies: Northern Lights, Sinanet, and Homeshark.com.

A regular meeting of Times Mirror's board of directors was convened on October 8, 1998.  A written report for this meeting contained the following statements:

### Mosby and Matthew Bender Update

Since our last Board meeting in July, substantial progress has been made in the divestiture of Mosby and Matthew Bender.

The divestiture of Matthew Bender/Shepard's * * * closed on July 31.  Times Mirror received $275 million in cash for the sale of our 50% interest in Shepard's and Liberty Bell I was funded with $1,375 million through the merger of Matthew Bender.  As indicated at the last Board meeting, the cash received by Times Mirror was used to repay short-term debt and the funds held by Liberty Bell will be invested in the repurchase of Times Mirror stock and in high-quality short-term investments.

In addition, the section of the October 8, 1998, board report entitled "Capital Planning Discussion" contained the following statements:

### Introduction

Since the July Board meeting, we have continued to sharpen our focus on our intended use of the proceeds from the Mosby and Matthew Bender dispositions as well as our continuing significant free cash flow.  It had not been our assumption that we would immediately turn around and use these resources as a war chest to finance a major acquisition program, and over the past several months we tested this presumption by examining in detail the prospect for value creation and the acceleration of earnings growth through acquisitions. * * *

* * * * * * *

Background

In August, with the closing of the Matthew Bender and Shepards divestitures, we began what we expect will be an extensive period of managing surplus capital.  * * *

Ultimately, our planning challenge is to assess realistically what the levels of spending might be in the primary areas of priority which we have stated to the Board before:

> # Capital investments in existing businesses to drive growth

> # Acquisitions that enhance our existing lines of business

> # Dividends necessary to maintain a payout ratio commensurate with our peer group average

> # Consistent with long-term capitalization goals, opportunistic stock repurchase

> *    *    *    *    *    *    *

Sizing Our Resources

In August, the closing of the divestiture of Matthew Bender resulted in the deposit of $1,375 million of gross proceeds into the account of Liberty Bell I, L.L.C., an investment affiliate of Times Mirror. Additionally, the divestiture of our share of the Shepards joint venture resulted in the deposit in Times Mirror's account of $275 million.  While the cash received by Times Mirror has all been used to retire short-term debt, the following approximately depicts the current deployment of capital within Liberty Bell:

|  | $ Millions |
|---|---|
| Short-term Money Market Assets | $1,000 |
| Times Mirror Common Stock[1] | 384 |
| Other | 2 |
| Total Liberty Bell Assets | $1,386 |

[1] At cost

\*      \*      \*      \*      \*      \*      \*

Looked at from a spending capacity viewpoint, the following shows our 1999-2001 total resources for investment:

|                                | $ Millions |
|--------------------------------|-----------|
| Current Surplus Balance[1]     | $1,400    |
| 1999-2001 Capex                | 375       |
| 1999-2001 Acquisitions         | 900       |
| Excess Debt Capacity Estimate  | 500       |
| Total 3-year Resources         | $3,175    |

[1] Includes Mosby proceeds

\*      \*      \*      \*      \*      \*      \*

Share Repurchase Status and Outlook

As previously discussed, we expect to have approximately $3.2 billion of investment capacity over the next few years.  Because our realistic expectations are to spend about $1.5 billion on acquisitions, capital projects and dividends, this leaves $1.5-$2 billion to be deployed in share repurchase, which is our highest return alternative in the absence of additional high-return acquisitions or capital projects.

\*      \*      \*      \*      \*      \*      \*

Investment Plans

Most immediately, we have concerned ourselves with establishing a short-term investment plan that emphasizes safety and liquidity.  Over time, any L.L.C. funds not deployed in acquisitions, capital investments or Times Mirror stock shall be managed under our Short-Term Investment Policy.

After the board of directors had considered the materials that had been presented to it regarding the LLC and Eagle Publishing (an LLC created for the Mosby transaction), the board approved resolutions with respect to the use of the LLC and Eagle

Publishing in Times Mirror's share repurchase program and in transactions involving the purchase of Times Mirror's outstanding debt securities.

During the period August 1 through December 31, 1998, Times Mirror directed the LLC to purchase (1) approximately 13.3 million shares of Times Mirror for between $750 million and $760 million and (2) interests in several Internet media companies for approximately $9 million.

In a finance report presented to the Times Mirror board of directors on February 4, 1999, the following statement appeared:

Resources-Background

In 1998, with the closing of the Matthew Bender, Mosby and Shepards divestitures, we began what we expect will be an extensive period of managing surplus capital.  As we have articulated in the past, our initial responsibility is to manage this cash under a short-term investment policy, which stresses preservation of capital.  This naturally results in returns commensurate with the low tolerance for risk.

Ultimately, our planning challenge is to assess realistically what the levels of spending might be in the primary areas of priority, which we have articulated before:

- Capital investments in existing businesses to drive growth

- Acquisitions that enhance our existing lines of business

- Dividends necessary to maintain a payout ratio commensurate with our peer group average

- Consistent with long-term capitalization goals, opportunistic stock repurchase

\*     \*     \*     \*     \*     \*     \*

Sizing Our Resources

In the second half of 1998, the closing of the
divestiture of Matthew Bender and Mosby resulted in the
deposit of $1,790 million of gross proceeds into the
accounts of the two Eagle LLC's, both investment
affiliates of Times Mirror.  Additionally, the
divestiture of our share of the Shepards joint venture
resulted in the deposit in Times Mirror's account of
$275 million.  While the cash received by Times Mirror
has all been used to retire short-term debt, the
following approximately depicts the 1/12/99 deployment
of capital within the Eagle LLC's:

|  | $ Millions |
|---|---|
| Short-term Money Market Assets | $1,025 |
| Times Mirror Common Stock (13.3M shares) | 780 |
| Tax Credit Partnerships[1] | 19 |
| New Media Investments[1] | 7 |
| Total Eagle Assets | $1,831 |

[1] At cost

A preliminary cash flow analysis for the 1999-2001
period enables us to forecast total resources available
to us.  The following table shows how much net cash is
used under our plans for spending in our major
investment categories:

| ($ Millions) | 1999 | 2000 | 2001 | 3-year Total |
|---|---|---|---|---|
| Cash From Operations | $383 | $401 | $434 | $1,218 |
| Capital Expenditures | (201) | (131) | (120) | (452) |
| Acquisitions, Net | (300) | (300) | (300) | (900) |
| Dividends | (80) | (83) | (89) | (252) |
| Annual Surplus/(deficit) | ($198) | ($113) | ($75) | ($386) |

Thus over the 3 years of our plan, before repurchase,
our total spending would be around $400 million out of
the $1.0 billion held by the investment LLCs.

\*     \*     \*     \*     \*     \*     \*

Conclusion

In consideration of the resources we have available and
the capital and acquisition spending we anticipate, we
are recommending a gross repurchase level of
approximately 4-5 million shares per year for the plan
period.  With approximately 3-4 million shares expected
to be issued each year through options and other equity
incentive programs, our planned repurchase level should
result in a net retirement of 1-2 million shares per
year in each of the next 3 years.  This will allow us
to invest for our continued growth while returning us
to an optimal capital mix.

After the board of directors had considered the materials
that had been presented regarding these matters, the board
approved resolutions regarding the use of the LLC and Eagle
Publishing in Times Mirror's share repurchase program.

On May 3, 1999, Udovic distributed a memorandum to, among
others, Unterman, Gastler, Niese, and Behnia regarding the
amendment of MB Parent's restated certificate of incorporation to
permit the payment of dividends on the shares of MB Parent's
common stock.  Udovic's memorandum contained the following
statements:

> In connection with distributing to Times Mirror the
> income of Eagle New Media Investments, LLC, attached is
> a draft of a Restated Certificate of Incorporation of
> CBM Acquisition Parent Co., Section 3(e) of Article V
> of which has been amended to permit the payment of
> dividends on shares of common stock.  * * *  Also
> attached are drafts of Board and shareholder
> resolutions approving the Restated Certificate of
> Incorporation.
>
> I have sent these drafts to Charlie Fontaine at Reed
> who has agreed to coordinate having the Restated
> Certificate approved and filed and dividends paid to
> Times Mirror.  The amounts currently proposed to be

paid to Times Mirror as dividends are $14,808,000 for the period ended December 31, 1998 and $4,536,000 (which is 65% of Eagle New Media's post-preferred dividend net income) for the quarter ended March 31, 1999. * * *

Reed agreed to the proposed amendment to MB Parent's restated certificate of incorporation because (1) Reed had no interest in the profits generated by the LLC and (2) Reed understood that none of the $1.375 billion that had been contributed to the LLC would ever be returned to Reed.

On June 24, 1999, the board of directors of MB Parent adopted resolutions that approved (1) the amendment of MB Parent's restated certificate of incorporation to permit the payment of dividends on the shares of MB Parent's common stock and (2) the declaration and payment of dividends on MB Parent's common stock and voting preferred stock. These resolutions stated, in pertinent part, the following:

4.  Amendment of the Restated Certificate of Incorporation of the Corporation.

* * * * * * *

RESOLVED, that the Restated Certificate of Incorporation of the Corporation be further amended by changing subsection (e) of Section 3 of the Article thereof numbered "Article V" so that, as amended, said subsection of said Article shall be and read as follows:

"(e) Restrictions on Junior Payments. So long as any shares of Voting Preferred Stock are outstanding, the corporation shall not, except only upon the unanimous vote of the Board of Directors, (i) declare, pay or set apart for payment any dividend on, or make any distribution

in respect of, Junior Securities or any warrants, rights, calls or options exercisable for, or convertible into, any Junior Securities, either directly or indirectly, whether in cash, obligations or shares of the corporation or other property (other than distributions or dividends solely in the form of a particular class or series of Junior Securities, or warrants, rights, calls or options exercisable for, or convertible into, such Junior Securities, to holders of such Junior Securities), (ii) make any payment on account of, or set apart for payment money for a sinking or other similar fund for the purchase, redemption, retirement or other acquisition for value of any of, or redeem, purchase, retire or otherwise retire for value any of, Junior Securities (other than as a result of a reclassification of Junior Securities or the exchange or conversion of one class or series of Junior Securities for or into another class or series of Junior Securities) or any warrants, rights, calls or options exercisable for, or convertible into, any of the Junior Securities, or (iii) permit any corporation or other entity directly or indirectly controlled by the corporation to purchase, redeem, retire or otherwise acquire for value any of the Junior Securities or any warrants, rights, calls or options exercisable for, or convertible into, any Junior Securities."

\* \* \* \* \* \* \*

## 5. Declaration of Dividends.

RESOLVED, that, subject to the receipt of dividends due to the Corporation upon the shares of capital stock of MB held by the Corporation in respect of the period from August 1, 1998 through June 30, * * * [1999], the Corporation declare and pay dividends upon its capital stock in respect of the period from August 1, 1998, through June 30, 1999 as set forth below:

| Class of Shares | Gross Amount | Amount per Share |
|---|---|---|
| Common Stock, par value $0.01 per share | $21,160,000.00 | $21,160.00 |
| Voting Preferred Stock, par value $0.01 per share | $ 3,466,145.20 | $ 866.5653 |

; and further

> RESOLVED, that, in accordance with Section 15 of that certain Limited Liability Company Agreement dated as of July 28, 1998 (the "LLC Agreement") among CBM Acquisition Parent Co., LEXIS Inc. and The Times Mirror Company ("TMC"), all Delaware corporations, the Corporation demand from Eagle New Media Investments, LLC, a Delaware limited liability company, a distribution in the amount of Twenty-One Million Eight Hundred Two Thousand Seventy Dollars and Eighty-Seven Cents ($21,802,070.87), to be paid not later than July 1, 1999 to partially fund the aforesaid dividends;
> * * *

Also on June 24, 1999, MB Parent's stockholders, i.e., REUS, REBV, and TMD, adopted resolutions that approved of the amendment to MB Parent's restated certificate of incorporation.

On June 30, 1999, Times Mirror, acting in its capacity as manager of the LLC, approved a distribution of $21,802,070.87 from the LLC to MB Parent. MB Parent used this distribution to pay the dividends that had been declared on its common stock and its preferred stock on June 24, 1999. In this regard, MB Parent distributed $21,160,000 to TMD and $642,070.87 (i.e., the difference between the $3,466,145.20 dividend that MB Parent had declared on its preferred stock and the $2,824,074.33 dividend that had accumulated on the Bender participating preferred stock owned by MB Parent between August 1, 1998, and June 30, 1999) to REUS and REBV. MB Parent neither declared nor made any other dividend distributions from the time of MB Parent's organization to the end of 2000.

Summary of the LLC's Investment Activity During 1999

During 1999, Times Mirror directed the LLC to purchase (1) approximately 2.1 million shares of Times Mirror common stock for between $125 million and $135 million; (2) interests in several Internet media companies; (3) Newport Media, Inc., for $132 million; (4) Airspace Safety Analysis Corp. and ASAC International, LLC, for $14.5 million; and (5) ValuMail, Inc. Times Mirror also directed the LLC to contribute $233,252,000 to TMCT II, LLC, an entity formed for the purpose of retiring stock held by the Chandler Trusts.

Times Mirror's and MB Parent's Income Tax Returns for 1998

On September 14, 1999, Gastler signed Times Mirror's Form 1120, U.S. Corporation Income Tax Return, for 1998.  Times Mirror did not disclose any information concerning the Bender transaction on this Form 1120 or on any attachments to this Form 1120.

On September 15, 1999, Vera Lang, treasurer of MB Parent, signed MB Parent's Form 1120 for 1998.  Attached to MB Parent's Form 1120 for 1998 was Schedule L, Balance Sheet per Books, on which MB Parent reported its total assets.  According to the Schedule L, the following amounts comprised MB Parent's total assets as of the end of 1998:  (1) $1,613,268 of "Other current assets" and (2) $1,457,251,204 of "Other investments".  Furthermore, the following amounts comprised MB Parent's "Other

investments" as of the end of 1998:  (1) $61,616,016 of "OTHER

INVESTMENTS" held by MB Parent; (2) $867,197,048 of "OTHER

INVESTMENTS" held by the LLC; and (3) $528,438,140 of "Marketable

securities" held by the LLC.  MB Parent also reported the value

of its capital stock on this Schedule L.  According to the

Schedule L, $68,750,000 of preferred stock comprised the total

value of MB Parent's capital stock as of the end of 1998.

MB Parent did not report a value for its common stock on this

Schedule L.  In addition, MB Parent reported its additional paid-

in capital on this Schedule L.  According to the Schedule L, the

value of MB Parent's additional paid-in capital was

$1.375 billion as of the end of 1998.

The Internal Revenue Service (IRS) began its audit of Times

Mirror's Form 1120 for 1998 sometime during February 2000.  On

March 15, 2000, Gastler signed the cover sheet to a packet of

documents that Times Mirror provided to the IRS as part of this

audit.  Included in this packet of documents was Form 8275,

Disclosure Statement, for the period January 1, 1997, through

December 31, 1998, for Times Mirror and its subsidiaries.

Referenced in an attachment to the Form 8275 were "Statements

previously submitted on February 18, 2000, indicating

reorganization of Matthew Bender and Company, per IRC

Section 368."  These statements included the following:

MATTHEW BENDER & COMPANY
STATEMENT PURSUANT TO IRC
REG. 1.368-3

Matthew Bender & Company was disposed of pursuant to an agreement and plan of merger dated April 27, 1998 by and between The Times Mirror Company, TMD Inc, a wholly owned subsidiary of Times Mirror and Reed Elsevier U.S. Holdings Inc., Reed Elsevier Overseas BV, CBM Acquisition Parent Co, MB Parent and CBM MergerSub Corp.  The transactions are fully described in the plan of merger attached.  The purpose of the transaction was to dispose of Matthew Bender in a transaction that would qualify as reorganization under Section 368 of the Internal Revenue Code of 1986 as amended.

## Times Mirror's Financial Reporting Following the Close of the Bender Transaction

On August 13, 1998, Unterman signed Times Mirror's

Form 10-Q, Quarterly Report Pursuant To Section 13 or 15(d) of

the Securities Exchange Act of 1934, for the company's quarterly

period ended June 30, 1998 (August 13, 1998, Form 10-Q).

Included in the August 13, 1998, Form 10-Q were condensed

consolidated financial statements for Times Mirror, notes to the

condensed consolidated financial statements, all of which were

unaudited, and management's discussion and analysis of the

company's financial condition and the results of the company's

operations.  The notes to these financial statements contained,

in pertinent part, the following comments:

Note 3--Discontinued Operations

The Company signed definitive agreements with Reed Elsevier plc on April 26, 1998 for the disposition of Matthew Bender & Company, Incorporated (Matthew Bender), the Company's legal publisher, in a tax-free reorganization and the sale of Times Mirror's 50%

ownership interest in Shepard's.  The two transactions were valued at $1.65 billion in the aggregate and were completed on July 31, 1998.  The disposition of Matthew Bender was accomplished through the merger of an affiliate of Reed Elsevier with and into Matthew Bender with Matthew Bender as the surviving corporation in the merger.  As a result of the merger, TMD, Inc., a wholly owned subsidiary of Times Mirror, received all of the issued and outstanding common stock of CBM Acquisition Parent Co. (MB Parent).  MB Parent is a holding company that owns controlling voting preferred stock of Matthew Bender with a stated value of $61,616,000 and participating stock of Matthew Bender.  MB Parent is also the sole member of Liberty Bell I, LLC (Liberty Bell I).  Affiliates of Reed Elsevier own voting preferred stock of MB Parent with a stated value of $68,750,000 which affords them voting control over MB Parent, subject to certain rights held by Times Mirror with respect to Liberty Bell I.  Concurrently with the closing of the merger, the Company became the sole manager of Liberty Bell I and controls its operations and assets.  At the time of the merger, the principal asset of Liberty Bell I was $1,375,000,000 of cash.  The consolidated financial statements of Times Mirror will include the accounts of Liberty Bell I.

The portion of the August 13, 1998, Form 10-Q entitled

"Management's Discussion and Analysis of Financial Condition and

Results of Operations" included the following statements:

General

In the second quarter of 1998, the Company reached agreements to divest its legal publisher Matthew Bender & Company, Incorporated (Matthew Bender), its 50% ownership interest in legal citation provider Shepard's, and its health sciences publisher Mosby, Inc. (Mosby).  On July 31, 1998, the Company completed the divestiture of Matthew Bender in a tax-free reorganization and the sale of the Company's interest in Shepard's to Reed Elsevier plc.  The two transactions were valued at $1.65 billion in the aggregate.  * * *

In anticipation of the expected impact of the divestitures, the Company has begun a comprehensive

review of its business configurations, operating systems and other investments to determine economically attractive actions it can take to prepare for future growth.  * * *

    In addition, the pace of share repurchase activity will be accelerated to result in the repurchase of approximately 9.0 million shares of Series A common stock in 1998.  The Company purchased 2.1 million shares through the 1998 second quarter.  On July 27, 1998, the Company entered into a forward purchase contract to purchase 2.0 million shares of Series A common stock.  Additionally, 2.7 million shares of Series A common stock were purchased subsequent to June 30, 1998.

            *    *    *    *    *    *    *


Liquidity and Capital Resources

            *    *    *    *    *    *    *


Acquisitions and Dispositions

            *    *    *    *    *    *    *


* * *  Concurrently with the closing of the Matthew Bender transaction, the Company became the sole manager of Liberty Bell I, LLC (Liberty Bell I), the principal asset of which was approximately $1.38 billion of cash. Subsequent to such closing, Liberty Bell I purchased 2.7 million shares of the Company's Series A common stock.  The Company intends to deploy the remaining assets of Liberty Bell I to finance acquisitions and investments, including purchases of the Company's common stock, and does not intend to use those funds for the Company's working capital purposes or to retire the Company's debt.  * * *

            *    *    *    *    *    *    *


Common Share Repurchases

    The Company repurchased 2.1 million and 6.5 million shares of its Series A common stock during the year to date periods ended June 30, 1998 and 1997, respectively.  On July 27, 1998, the Company entered into a forward purchase contract to purchase

2.0 million shares of Series A common stock.
Additionally, Liberty Bell I purchased 2.7 million
shares of Series A common stock subsequent to June 30,
1998.  The Company believes that the purchase of shares
of its common stock by Liberty Bell I is an attractive
investment for Liberty Bell I that will also enhance
Times Mirror shareholder value as well as offset
dilution from the shares of common stock issued under
the Company's stock-based employee compensation and
benefit programs.  * * *

On August 17, 1998, Unterman signed Times Mirror's Form 8-K,
Current Report Pursuant To Section 13 or 15(d) of the Securities
Exchange Act of 1934, which reported the events of July 31, 1998,
to the Securities and Exchange Commission (SEC) (August 17, 1998,
Form 8-K).  Included in the August 17, 1998, Form 8-K was an
unaudited pro forma condensed consolidated balance sheet that
reflected Times Mirror's disposition of Bender and its 50-percent
interest in Shepard's.  The adjustments shown in the pro forma
condensed consolidated balance sheet gave effect to Times
Mirror's disposition of Bender and its 50-percent interest in
Shepard's as if those transactions had occurred on June 30, 1998.
In so doing, the pro forma condensed consolidated balance sheet
recorded the gain on Times Mirror's disposition of Bender and its
50-percent interest in Shepard's by debiting "Cash and cash
equivalents", an asset category, $1,649,650,000.

On February 22, 1999, Willes signed Times Mirror's annual
shareholder report for 1998.  In the section entitled "Letter to
Shareholders", Willes made the following statements:

1998 was a record year for Times Mirror.  * * *
Clearly our biggest accomplishment last year was the
divestiture of Matthew Bender and Mosby for over
$2 billion in value, a whopping 17 times cash flow.
These transactions eliminated a major strategic
vulnerability for the company.  And because they were
done in a tax-efficient way, we can redeploy the
resources in ways that will enhance the earnings power
of Times Mirror.

In addition, the section entitled "A Crisis of Growth" contained

the following statements:

In 1998 * * * [Newsday] again increased
circulation and revenue, partly because it employed
innovative ventures to do so.  * * *  It has organized
a separate effort to distribute advertising shoppers
throughout Long Island and New York City and a Times
Mirror affiliate just recently acquired a chain of
weekly papers to increase Newsday's role in printed
advertising in its circulation area.

* * * * * * *

Fortunately for a company responding to a changing
world, Times Mirror has immense resources.  The sale in
1998 of the Matthew Bender and Mosby legal and medical
publishing units has given Times Mirror a gain of
$1.35 billion.

That enormous chunk of capital awaits redeployment
in Times Mirror operations or in acquisition of other
companies.  * * *

* * *  Times Mirror is budgeting $300 million for
acquisitions in 1999.  * * *

* * *  Chains of small newspapers are being
acquired in the circulation areas of Newsday and The
Baltimore Sun.  Up to $50 million a year is being
invested in venture capital backing for Internet start-
ups to gain expertise and give the company expertise
and participation in developing technologies.

* * *  The big $1.3-billion proceeds from the
Mosby-Bender sale would be brought into play if
newspaper acquisition opportunity came up in adjacent

markets, such as San Diego or Las Vegas.  Times Mirror
could swing a very big acquisition:  With its own
capital plus borrowing power, the company could easily
finance a $4-billion, even a $5-billion acquisition.

The section entitled "Financial Questions and Answers" contained

the following statements:

Following the 1998 divestitures, Times Mirror has
considerable cash resources.  What are your priorities
for reinvestment?

Times Mirror has significant financial flexibility as
we enter 1999.  With control over more than $1 billion
of cash resources and further debt capacity available,
we are very well positioned to pursue new
opportunities.

Unterman and Times Mirror's board of directors signed Times

Mirror's 1998 Form 10-K on March 4, 1999.  Part I contained the

following statements:

During 1998, Times Mirror engaged in several
strategic transactions including the divestiture of
Matthew Bender & Company, Incorporated, a publisher of
legal information, the Company's 50% interest in
Shepard's, a legal citation provider, and Mosby, Inc.,
a publisher of health science information.  * * *  In
February 1999, an investment affiliate of the Company
acquired Newport Media, Inc., a publisher of shopper
publications in the Long Island and New Jersey areas.

The Company continued to have an active share
purchase program with a total of 16.7 million shares of
Series A Common Stock acquired by the Company or its
affiliates during 1998 * * *.  In 1998, the Company, in
anticipation of the expected impact of divestitures,
also began a comprehensive review of its business
configurations, operating systems and other investments
to determine economic actions it could take to prepare
for future growth.  * * *

Part II contained, among other information, management's

discussion and analysis of the company's financial condition and

results of operations, the audited consolidated financial statements for Times Mirror, and the notes to the company's consolidated financial statements.  According to Times Mirror's consolidated balance sheets, the company's current assets totaled $1,629,259,000 as of December 31, 1998, and its total assets amounted to $4,218,306,000 as of that time.  Both of these amounts included the "proceeds of reorganization", i.e., the proceeds from (1) the Bender transaction, (2) the sale of Times Mirror's 50-percent interest in Shepard's, and (3) the Mosby transaction.

The portion of part II of Times Mirror's 1998 Form 10-K that comprised management's discussion and analysis of Times Mirror's financial condition and results of operations contained the following statements:

OVERVIEW

The Company achieved record earnings in 1998 with net income of $1.42 billion, or $16.06 per share on a diluted basis, compared with 1997 net income of $250.3 million, or $2.29 per share.  The 1998 results reflect:

- An after-tax gain of $1.35 billion, or $15.50 per share, on the disposition of Matthew Bender/Shepard's and Mosby and $30.8 million, or $.35 per share, of after-tax losses associated with discontinuance of certain other businesses.

*     *     *     *     *     *     *

- Share purchases in 1998 which reduced the number of shares of common stock outstanding for financial reporting

purposes to 73.4 million at December 31, 1998 compared with 87.9 million at December 31, 1997.

\*   \*   \*   \*   \*   \*   \*

Discontinued Operations

On July 31, 1998, the Company completed the divestiture of Matthew Bender & Company, Incorporated and its 50% ownership in legal citation provider Shepard's to an affiliate of Reed Elsevier, Inc. in a transaction valued at $1.65 billion.  Additionally, on October 9, 1998, the Company completed the divestiture of Mosby, Inc., its health science and medical publisher, to Harcourt General, Inc. in a transaction valued at $415.0 million.

\*   \*   \*   \*   \*   \*   \*

Share Purchases

Share purchases continued in 1998 through open market transactions, accelerated purchases and purchases by an affiliated limited liability company. A total of 16.7 million Series A common shares were acquired during 1998 which more than offset 2.1 million shares issued as a result of the exercise of stock options.

CONSOLIDATED RESULTS OF OPERATIONS

\*   \*   \*   \*   \*   \*   \*

1998 Compared with 1997

\*   \*   \*   \*   \*   \*   \*

Earnings per share for 1998 benefited principally from the net gain on divestitures as well as a reduction in the average number of common shares outstanding and lower preferred dividend requirements. \* \* \*

Net interest expenses declined in 1998 due to an increase in interest income resulting from investment activity of the affiliated limited liability companies created as part of the Matthew Bender and Mosby

transactions.  Higher interest income more than offset a rise in interest expense primarily due to increased debt levels attributable to common stock purchases, the 1997 third quarter recapitalization and new acquisitions.

*     *     *     *     *     *     *

LIQUIDITY AND CAPITAL RESOURCES

*     *     *     *     *     *     *

Acquisitions

*     *     *     *     *     *     *

In February 1999, Eagle New Media Investments, LLC, an investment affiliate of the Company, acquired Newport Media, Inc., a publisher of shopper publications in the Long Island and New Jersey areas, for $132 million.

Dispositions

On July 31, 1998, the Company completed the divestiture of Matthew Bender in a tax-free reorganization and the sale of the Company's 50% ownership interest in Shepard's to Reed Elsevier plc. The two transactions were valued at $1.65 billion in the aggregate.  Proceeds from the sale of Shepard's were used to pay down commercial paper and short-term borrowings of $222.4 million.  Concurrently with the closing of the Matthew Bender transaction, the Company became the sole manager of Eagle New Media Investments, LLC (Eagle New Media).  At December 31, 1998, the assets of Eagle New Media were $605.8 million of cash and cash equivalents, $753.0 million of Times Mirror stock, $15.0 million of marketable securities and $22.3 million of other assets.  On October 9, 1998, the Company completed the divestiture of Mosby, Inc. to Harcourt General, Inc. in a transaction valued at $415.0 million.  Concurrently with the closing of the Mosby, Inc. transaction, the Company became the sole manager of Eagle Publishing Investments, LLC (Eagle Publishing).  At December 31, 1998, the assets of Eagle Publishing were $377.2 million of cash and cash equivalents, $34.5 million of marketable securities and $20.1 million of other assets.  * * *  The Company

intends to deploy the assets of both LLCs to finance acquisitions and investments, including purchases of the Company's common stock, and does not intend to use those funds for the Company's general working capital purposes.  For financial reporting purposes, Eagle New Media and Eagle Publishing are consolidated with the financial results of the Company.

The portion of part II of Times Mirror's 1998 Form 10-K that comprised the notes to the company's consolidated financial statements included the following:

Note 4--Reorganization

During the third quarter of 1998, the Company completed the disposition of Matthew Bender in a tax-free reorganization with Reed Elsevier plc.  The disposition of Matthew Bender was accomplished through the merger of an affiliate of Reed Elsevier with and into Matthew Bender with Matthew Bender as the surviving corporation in the merger.  As a result of the merger, TMD, Inc., a wholly-owned subsidiary of Times Mirror, received all of the issued and outstanding common stock of CBM Acquisition Parent Co. (MB Parent).  MB Parent is a holding company that owns controlling voting preferred stock of Matthew Bender with a stated value of $61,616,000 and participating stock of Matthew Bender.  MB Parent is also the sole member of Eagle New Media Investments, LLC (Eagle New Media).  Affiliates of Reed Elsevier owned voting preferred stock of MB Parent with a stated value of $68,750,000 which affords them voting control over MB Parent, subject to certain rights held by Times Mirror with respect to Eagle New Media.  Concurrently, with the closing of the merger, the Company became the sole manager of Eagle New Media and controls its operations and assets.  At December 31, 1998, the assets of Eagle New Media were $605,786,000 of cash and cash equivalents, $752,956,000 (13,362,000 shares) of Series A common stock of Times Mirror, $14,952,000 of marketable securities and $22,270,000 of other assets. The consolidated financial statements of the Company include the accounts of Eagle New Media.

\*     \*     \*     \*     \*     \*     \*

The Company intends to deploy the assets of both LLCs to finance acquisitions and investments, including purchases of the Company's common stock, and does not intend to use those funds for the Company's general working capital purposes.

\*   \*   \*   \*   \*   \*   \*

Note 13--Capital Stock and Stock Purchase Program

\*   \*   \*   \*   \*   \*   \*

Treasury Stock.  Treasury stock includes shares of Series A common stock and Series A preferred stock owned by affiliates as well as Series A common stock purchased by the Company as part of the stock purchase program.  Approximately 13,262,000 \* \* \* shares of Series A common stock included in treasury stock are owned by Eagle New Media \* \* \*

Stock Purchases.  During 1998, the Company and Eagle New Media purchased 16,355,000 common shares for a total cost of $947,203,000.  \* \* \*

\*   \*   \*   \*   \*   \*   \*

In connection with the Company's ongoing stock purchase program, in October 1998, the Company's Board of Directors authorized the purchase over the next two years of an additional 6,000,000 shares of common stock.  The aggregate remaining shares authorized for purchase at December 31, 1998 was approximately 1,100,000 shares.  The Company believes that the purchase of shares of its common stock is an attractive investment for Eagle New Media which will enhance Times Mirror shareholder value as well as to offset dilution from shares of common stock issued under the Company's stock-based employee compensation and benefit program. In February 1999, the Board of Directors authorized the purchase of an additional amount of up to 6,000,000 shares of its Series A common stock.

\*   \*   \*   \*   \*   \*   \*

Note 21--Subsequent Events

\*   \*   \*   \*   \*   \*   \*

In February 1999, Eagle New Media Investments, * * * LLC, an investment affiliate of the Company, acquired Newport Media, Inc., a publisher of shopper publications in the Long Island and New Jersey areas, for approximately $132,000,000.

Efrem Zimbalist III, who had succeeded Unterman as chief financial officer of Times Mirror, signed Times Mirror's 1999 Form 10-K on March 29, 2000.  Part I contained the following statements:

ITEM 1.  BUSINESS.

GENERAL

          *     *     *     *     *     *     *

During 1999, Times Mirror engaged in several strategic transactions including the acquisition by an investment affiliate of Newport Media, Inc., a publisher of shopper publications in the New York and New Jersey areas, ValuMail, Inc., a shared mail company that distributes preprinted advertising in Connecticut and Massachusetts, and Airspace Safety Analysis Corporation, a provider of airspace utilization and Federal Aviation Administration compliance services for the telecommunications and aviation industries.  * * *

In September 1999, Times Mirror, its affiliates and its largest stockholders, the Chandler Trusts, completed a transaction that, for financial reporting purposes, reduced Times Mirror's outstanding common stock by 12.4 million shares and reduced Times Mirror's then outstanding Series C Preferred Stock by 501,000 shares.  * * *

The annual report referred to various investment activities in newspaper publishing as directly engaged in by Times Mirror.  The annual report contained no reference to Reed as having any interest in the "affiliate" actually engaged in the investment activity.

Part II of Times Mirror's 1999 Form 10-K contained, among other information, management's discussion and analysis of the company's financial condition and results of operations, audited consolidated financial statements for Times Mirror, and the notes to the company's consolidated financial statements.  The portion of part II that comprised management's discussion and analysis of Times Mirror's financial condition and results of operations contained the following statements:

Overview

              *     *     *     *     *     *     *

1999 Recapitalization

     In September 1999, the Company completed a recapitalization transaction with its largest shareholders, the Chandler Trusts, in which the Company, including certain of its affiliates, and the Chandler Trusts each contributed assets worth $1.24 billion to TMCT II, LLC, a newly formed limited liability company.  The 1999 recapitalization resulted in a net effective reduction, for financial reporting purposes, in the number of shares of the Series A and C common stocks by 12.4 million shares and in the Company's Series C-1 and C-2 preferred stocks by 501,000 shares.  * * *

              *     *     *     *     *     *     *

Liquidity and Capital Resources

     * * *  In 1999, funds from the Company's investment affiliates created as part of the 1998 divestitures of the Company's legal and medical publishing businesses, as well as proceeds from new debt issuances were used to finance the 1999 recapitalization and acquisitions.  In the second half of 1998, the company utilized a portion of the investment affiliates resources for share purchases and acquisitions.  * * *

\*   \*   \*   \*   \*   \*   \*

<u>Dispositions</u>

\*   \*   \*   \*   \*   \*   \*

In July 1998, the Company completed the divestiture of Matthew Bender in a tax-free reorganization and the sale of the Company's 50% ownership interest in Shepard's to Reed Elsevier plc. The two transactions were valued at $1.65 billion in the aggregate.  In October 1998, the Company completed the divestiture of Mosby, Inc. to Harcourt General, Inc. in a transaction valued at $415.0 million. Concurrently with the closing of the Matthew Bender and Mosby, Inc. transactions, the Company became the sole manager of Eagle New Media Investments, LLC (Eagle New Media) and Eagle Publishing Investments, LLC (Eagle Publishing).  A substantial portion of the assets of Eagle New Media and Eagle Publishing were utilized in connection with the 1999 recapitalization (see Note 2). The Company intends to deploy the assets of both Eagle New Media and Eagle Publishing to finance acquisitions and investments, including purchases of the Company's common stock, and does not intend to use those funds for the Company's general working capital purposes.

<u>Common Share Purchases</u>

During 1999, the Company and Eagle New Media purchased 3.2 million shares of the Company's Series A common stock which more than offset 2.0 million shares issued as a result of the exercise of stock options \* \* \*.

The Company believes that the purchase of shares of its common stock is an attractive investment for Eagle New Media which will also enhance Times Mirror shareholder value as well as offset dilution from shares of common stock issued under the Company's stock-based employee compensation and benefit programs. The Company and its affiliates expect to make share purchases primarily to offset stock option exercises, during the next two years in the open market or in private transactions, depending on market conditions, and such purchases may be discontinued at any time. \* \* \*  As of December 31, 1999, the Company and its

affiliates are authorized to purchase 3.9 million shares of Series A common stock.

## The LLC's Financial Statements for the Fiscal Years Ended December 31, 1999 and 1998

On April 6, 2000, Udovic faxed to Fontaine a copy of the LLC's unaudited financial statements for the fiscal years ended December 31, 1999 and 1998.  A statement of operations was part of these financial statements.  On the statement of operations, the LLC reported $2,435,000 and $10,132,000 of dividend income attributable to its Times Mirror stock for 1998 and 1999, respectively.

Included with the LLC's financial statements were notes that contained, in pertinent part, the following comments:

Note 1--Basis of Preparation

* * *  The Company's sole manager is The Times Mirror Company who controls its operations and assets.  The Company began operations on July 31, 1998.

*     *     *     *     *     *     *

Note 2--Cash and Cash Equivalents, Marketable Securities, Available-for-sale Securities and Investments

*     *     *     *     *     *     *

Investments in Times Mirror stock are reported at cost, as they are restricted from sale because the Company is considered an affiliate of Times Mirror.  The fair value of the Times Mirror stock based on its quoted market price was $1,015,186,000 and $742,666,000 at December 31, 1999 and 1998, respectively.  * * *

*     *     *     *     *     *     *

Note 4--1999 Recapitalization

In September 1999, the Company and certain of its affiliates participated in a transaction (1999 recapitalization) involving agreements with Times Mirror Company's largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2. The 1999 recapitalization resulted in the formation of a new limited liability company, TMCT II, LLC (TMCT II).

Pursuant to the TMCT II contribution agreement, the Company contributed a total of $233,252,000 in cash and cash equivalents.

On May 31, 2000, the board of directors of MB Parent accepted and approved the LLC's financial statements for the fiscal years ended December 31, 1999 and 1998.

IRS Determinations

On August 14, 2002, the IRS sent to petitioner a statutory notice of deficiency with respect to petitioner's Federal income tax for 1998. In the statutory notice of deficiency, the IRS made the following determinations regarding the Bender transaction:

1. $1,375,000,000 is the amount realized in 1998 under Code section 1001 by TMD in exchange for the 100% common stock interest in MB [Bender].

2. In 1998, TMD must recognize capital gain in the amount of $1,322,035,840, as computed below. * * * TMD's exchange of its 100% common stock interest in MB is ineligible for nonrecognition treatment under Code section 354 because the series of prearranged transactions that included the merger of Bender Mergersub into MB failed to qualify as a "reorganization" under section 368 of the Code.

In addition, the IRS explained the basis for its determinations under the following headings: "A. TMD CASHED OUT ITS INVESTMENT

IN MB", "B.  TMD FAILED TO EXCHANGE ITS MB COMMON STOCK FOR STOCK

OF MB PARENT WORTH AT LEAST $1.1 BILLION", and "C.  AFTER THE

MERGER, POST-MERGER MB, THE SURVIVING CORPORATION FAILED TO HOLD

'SUBSTANTIALLY ALL' OF ITS PROPERTIES AND THE PROPERTIES OF THE

'MERGED' CORPORATION".  Under the last heading, the notice

elaborated:

> D.    TMD RECEIVED CONSIDERATION OTHER THAN VOTING
>       STOCK.
>
> To qualify as a reorganization under Code section
> 368(a)(1)(B), only voting stock may be used by the
> acquiring corporation.  The merger of Bender Mergersub
> into MB could not qualify as a "B" reorganization if
> TMD received, in exchange for its MB common stock, any
> consideration other than voting stock ("boot").
>
> In exchange for its MB common stock, TMD received
> MB Parent common stock and constructively received the
> rights to manage Eagle I, which it assigned to TM.
> Immediately after the merger, Eagle I's sole asset was
> $1.375 billion in cash.  The provisions of the Eagle I
> LLC Agreement, coupled with the broad powers granted to
> the manager, gave TM direct access to and control over
> the $1.375 billion.
>
> The rights to manage Eagle I were not voting
> stock, had substantial value, and were constructively
> received by TMD in exchange for its MB common stock.
> Since TMD received boot in exchange for its interest in
> MB, the merger of Bender Mergersub into MB failed to
> qualify as a reorganization under Code section
> 368(a)(1)(B).

The notice also determined that section 269 applies to deny

nonrecognition treatment of the Bender transaction.

During trial of this case, the parties agreed that TMD's

adjusted basis in its Bender common stock was $78,454,130 as of

July 31, 1998, rather than the $52,964,160 amount that had been determined by the IRS in the statutory notice of deficiency.

ULTIMATE FINDINGS OF FACT

The primary consideration received by Times Mirror, through TMD, for transferring control over the operations of Bender to Reed was control over $1.375 billion paid by Reed, through MB Parent, to the LLC.

The agreements and corporate organization documents entered into by Times Mirror and Reed negated any meaningful fiduciary obligations between Times Mirror and Reed with respect to Times Mirror's control over the cash or Reed's operation of Bender.

The MB Parent common stock held by TMD had a value of less than $1.1 billion and less than 80 percent of the $1.375 billion paid by Reed.

The Bender transaction effected a sale of Bender by TMD to Reed.

OPINION

Section 354(a) states the general rule that "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." Section 356 requires recognition of gain from an exchange in which property other than that permitted under

section 354 (or section 355) (i.e., boot) is received; the gain recognized is not in excess of the sum of money or the fair market value of other property received in the exchange.  Section 368 sets forth definitions of corporate reorganizations that qualify for nontax treatment under section 354(a).

Times Mirror and its advisers intended that the Bender transaction qualify as a tax-free "reverse triangular merger" under section 368(a)(1)(A) and (2)(E).  As described by petitioner, a reverse triangular merger is a statutory merger in which the merged corporation (MergerSub) merges with and into the target corporation (Bender) in exchange for stock of a corporation (MB Parent), which, immediately prior to the merger, controlled the merged corporation.

Respondent contends that the Bender transaction does not qualify as a reverse triangular merger because TMD received more than qualifying stock of MB Parent and the transaction thus fails to satisfy the "exchange" requirement of section 368(a)(2)(E)(ii), that is:  "in the transaction, former shareholders of the surviving corporation exchanged, for an amount of voting stock of the controlling corporation, an amount of stock in the surviving corporation which constitutes control of such corporation."  Section 368(c) defines "control" as "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote

and at least 80 percent of the total number of shares of all other classes of stock of the corporation." Respondent argues that TMD's gain on the Bender transaction is taxable unless the fair market value of qualifying consideration, the MB Parent common stock, was at least equal in value to a "controlled block" (80 percent) of Bender stock. The parties agree that this requirement means that the MB Parent common stock must have had a value of $1.1 billion for the transaction to qualify as a reverse triangular merger.

Alternatively, and in order to assert reliance on certain rulings of respondent, petitioner argues that the Bender transaction qualifies under section 368(a)(1)(B), which provides:

> SEC. 368(a). Reorganization.--
>
> (1) In general.--For purposes of parts I and II and this part, the term "reorganization" means--
>
> * * * * * * *
>
> (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

Petitioner's alternative position would not require valuation of the MB Parent common stock. It would, however, require us to

conclude that Times Mirror's control over the cash in the LLC was not part of the consideration received in the Bender transaction because it was not intended by Times Mirror or Reed to be a "separate asset".

Respondent argues that the Bender transaction did not qualify under section 368(a)(1)(B) because TMD did not exchange its Bender stock solely for voting stock. In addition, respondent argues that petitioner has belatedly changed its theory and should be precluded from doing so.

In form, at the conclusion of the Bender transaction, TMD was the holder of MB Parent common stock and no longer owned Bender common stock. Determination of whether the MB Parent common stock had a value of $1.1 billion or, in the alternative, whether the sole consideration exchanged for the Bender common stock was the MB Parent common stock requires a factual analysis of the totality of the Bender transaction. Because the same facts lead us to our conclusions on both theories, we do not need to decide whether petitioner is too late in asserting its section 368(a)(1)(B) argument.

<u>Factual Analysis of the Bender Transaction</u>

Not surprisingly, the parties differ significantly in their descriptions of the Bender transaction. While paraphrasing portions of the record, the parties cannot resist characterizing events in a manner consistent with their respective positions.

Petitioner emphasizes the formalities of the multicorporate structure, which undeniably was intended and carefully designed to comply with the requirements for a tax-free reorganization under section 368. Petitioner asserts that "respondent erroneously substitutes his version of the Bender transaction for what actually transpired."

Respondent does not deny that there was a business purpose for the Bender transaction, i.e., the desire of Times Mirror to get out of the legal publishing business because of the trends in that market. Pointing to specific aspects and results of the transaction, however, respondent argues:

> All of the unusual features of the Bender Transaction structure, the creation of a dormant intermediary company (MB Parent) and an enslaved LLC (Eagle I), the interlocking tiers of redeemable Bender and MB Parent voting preferred stock that transferred virtually complete control over Bender to Reed, and the provisions of the LLC Agreement, that transferred absolute control over the cash to the manager (TM), were united to a single purpose: segregate and seal off TM's interest in the cash and Reed's interest in Bender, one from the other.

> The substance of the Bender Transaction is a swap. TM gave up Bender for the right to control and distribute to itself at will $1.375 billion of cash. Reed gave up $1.375 billion of cash for ownership and control of Bender. This is hardly the kind of readjustment of continuing interests in property under modified corporate form that marks a real reorganization. * * *

The proposed findings of fact set forth in the briefs of the parties cannot be adopted as our findings because they lack objectivity either by omission or in argumentative descriptions.

Rather than attempting to reconcile the parties' characterizations of particular events, we have reviewed the entire record and related in great detail the contemporaneous statements of the parties to the Bender transaction, the contractual terms, the subsequent conduct of the parties to the transaction, and the representations of Times Mirror to shareholders and to regulatory bodies. The form of the transaction includes the totality of the contractual arrangements and is not limited to the design, characterization, and labels put on the arrangements by the Times Mirror tax advisers. In analyzing the terms and provisions of the contractual arrangements, we have considered the interpretation of the parties to them, as demonstrated by their conduct.

Times Mirror's View of the Bender Transaction

Times Mirror, for good business reasons, decided to take advantage of the existing trends in legal publishing and the strong desire of Wolters Kluwer and Reed to acquire Times Mirror's interest in Bender and Shepard's. The bidders agreed to the CJV "reorganization" structure promoted by PW and GS and endorsed by GD&C and E&Y because that was the only way they could acquire their target.

Times Mirror was anxious to have the significant proceeds of its divestiture of Bender to spend on repurchasing its own stock and diversifying into other emerging areas. After the proposed

structure of the divestiture was presented to the competing

bidders, at the board meeting on April 24, 1998, the board of

directors was told:

> The Price Waterhouse structure separates ownership and control so that the acquiring company controls Matthew Bender and Times Mirror controls an amount of cash equivalent to Matthew Bender's value, but without having paid a tax for the shift in control.
>
> The steps in this structure * * * involve the creation of a special purpose corporation (referred to as MB Parent * * *) that is owned partly by Times Mirror and partly by the acquiring company.  This special purpose corporation is controlled by the acquiring company through its ownership of relatively low value, nonparticipating preferred stock with 80% voting control.  MB Parent in turn owns preferred stock and nonvoting common stock in an acquisition subsidiary that will merge with Matthew Bender and a nonvoting interest in a single member limited liability company that holds the cash referred to above.  As a result of the merger of Matthew Bender into the acquisition subsidiary, Times Mirror will own all of the common stock and remaining 20% voting power of MB Parent, the special purpose corporation.  However, even though Times Mirror will not have voting control over MB Parent, it will control the limited liability corporation holding all of the cash by virtue of being the sole (nonequity) manager of the LLC.
>
> The results are as follows:
>
> • Times Mirror will control the LLC, thereby controlling the cash in it and any assets or businesses acquired with such cash.
>
> • Times Mirror and the LLC will be consolidated for financial reporting purposes.
>
> • The acquiring company will control Matthew Bender and will be able to consolidate for financial reporting purposes.
>
> • The merger of Matthew Bender into the acquisition subsidiary in exchange for MB Parent common stock

will qualify as a tax-free reorganization for tax purposes (even though such common stock does not carry with it voting control).

- MB Parent, the LLC and Matthew Bender will not be consolidated for tax purposes with either Times Mirror or the acquiring company.

- At some later date and upon mutual agreement, the Matthew Bender and MB Parent preferred stock can be redeemed at face value and the nonvoting common can be redeemed at a formula price, which would leave the acquiring company as the sole owner of Matthew Bender and Times Mirror as the sole, and controlling owner of MB Parent, with the ability to liquidate MB Parent and the LLC without a tax cost.

In a memorandum dated April 29, 1998, E&Y recorded the

following:

Times Mirror has entered into an agreement with Reed Elsevier for the sale of Matthew Bender for $1,375,000,000 and the sale of Times Mirror's interest in Shepard's Inc. for $225,000,000. The sale of Matthew Bender is structured as a reorganization in which the $1,375 million proceeds from the sale will end up in an LLC whose ownership is as shown in the attached chart. Through the various shareholder agreements, certificates of incorporation and the LLC management agreement, Times Mirror has total control over the assets and operations of the LLC and Reed Elsevier has total control over the assets and operations of Matthew Bender. The structure is designed to result in no tax due by Times Mirror on the profit from the sale of Matthew Bender.

* * * * * * *

Consolidation

* * * Times Mirror controls the assets of the LLC through the management agreement, which specifically states that Times Mirror has no fiduciary duty to the holder of Acquisition Parent and may use its discretion as to the use of the assets. Times Mirror may have the LLC buy its own debt instruments or Times Mirror stock,

make business acquisitions or any other transaction to the benefit of Times Mirror.  The only limitation is that Times Mirror may not upstream LLC assets to itself.

* * * * * * *

Times Mirror has the ability to ensure that the Board of Directors of Acquisition Parent may not do anything that may affect the control or viability of the LLC. Certain board actions require the unanimous vote of the Board.  These include:

• the incurrence of indebtedness or guarantees of indebtedness of Acquisition Parent

• the sale, transfer or other disposition, pledge or assignment of any portion or all of its LLC interest

• the issuance of any other securities of Acquisition Parent

All of these factors indicate that Times Mirror not only controls the assets of the LLC, but also is the beneficiary of all of the ownership risks and rewards of the LLC.  * * *

We cannot improve on the descriptions of the Bender transaction in the above contemporaneous statements of the participants.  Little more would be required to conclude that the Bender transaction was, in substance, a sale.  The issue in this case, however, is to determine whether the "reorganization" structure satisfies the requirements of sections 354(a) and 368 and precludes taxation of the gain derived from the transaction.

Fiduciary Obligations Among the Parties

In the context of the dispute over the value of the MB Parent common stock received by TMD, as discussed below,

petitioner argues that Times Mirror, as manager of the LLC, had fiduciary obligations that precluded unlimited use of the LLC's cash and prevented a conclusion that TMD or Times Mirror realized the proceeds of a sale of Bender. Respondent contends that Times Mirror's only fiduciary obligation under the management agreement was to itself. The LLC agreement dated July 28, 1998, contained provisions including the following:

> 9. <u>Management</u>.
>
> a. The Manager shall have the sole right to manage the business of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company, and no Member or other person other than the Manager shall have any authority to act for or bind the Company or to vote on or approve any of the actions to be taken by the Company (unless otherwise expressly required by the Act or other applicable law). Notwithstanding the foregoing, the Initial Manager shall not take any action in respect of or on behalf of the Company, other than the opening of one or more bank accounts in the name of the Company, the appointment of an agent for service of process for the Company and the performance of other ministerial duties in connection with the organization and formation of the Company. Accordingly, as of the Effective Time of the Merger, the Company shall have no liabilities or obligations other than pursuant to this Agreement.
>
>       *    *    *    *    *    *    *
>
> e. Without limiting the generality of the foregoing, to the fullest extent permitted by law, including Section 18-1101(c) of the [Delaware Limited Liability Company] Act, and without creating any duties or obligations of the Manager by implication or otherwise, it is expressly acknowledged and agreed that to the extent the Manager owes any fiduciary duties or similar obligations to the Initial Member [MB Parent] under any principles of law or equity or otherwise, such duties and obligations shall be owed solely to the

holders of the Initial Member's [MB Parent's] common equity and not to the holders of any other class of the Initial Member's [MB Parent's] equity.

Petitioner's brief, in attacking respondent's valuation experts, asserts:

The LLC Agreement was written with the understanding that the manager, TM, would be the 100% indirect owner of the MBP [MB Parent] Common.  * * *

*    *    *    *    *    *    *

* * * the management authority and the MBP Common were not owned by two parties; TM was not only the manager, but also the 100% indirect owner of the MBP Common, which was directly owned by a holding company which TM had created to hold TM's property.  The rights to be valued are in fact the rights held by one party.  * * *

Petitioner does not point to any provision in the documentation of the transaction that restricts Times Mirror's use of the LLC's cash, although petitioner asserts limitations under Delaware law.  Representations of Times Mirror to its shareholders indicated that the cash in the LLC would not be used for working capital but would be used for repurchase of stock and strategic investments.  However, nothing in the documents contains this restriction on the use of cash for working capital, which was a management decision consistent only with tax advice given to Times Mirror.  The advisers, Shefter and Behnia, had made it clear to Reed before the transaction that "the LLC agreement will not contain any restrictions on the use of the cash."  In any event, cash is fungible.  Use of the LLC's cash in

Times Mirror's ambitious stock repurchase program obviously freed up other resources to be used for working capital.

Reed's vice president of taxes, Fontaine, who negotiated the structure on behalf of Reed, testified:

> Q  [Counsel for petitioner]  And what was Reed's position with regard to nonvoting common stock in the structure?
>
> A  [Fontaine]  Reed did not like the fact that it was common stock.  We were hoping that it would be changed to a preferred stock because of issues surrounding fiduciary duties.
>
> Q  Could you elaborate?
>
> A  Generally speaking, a common shareholder is owed a fiduciary duty, and because Matthew Bender at the time would have had a common shareholder of MB Parent, and indirectly TMD, that that would be--there would be a fiduciary duty ultimately to Times Mirror as a result of that shareholding as to the operations of Matthew Bender.
>
> Q  What was the result of those negotiations?
>
> A  The nonvoting common stock was changed to nonvoting participating preferred stock.

Thus, the parties understood that they were deliberately negating any fiduciary obligations owed to Reed with respect to the cash or owed to Times Mirror or TMD with respect to Bender operations.

Times Mirror's understanding of its rights with respect to the cash was described in its report to the board on October 8, 1998, as follows:

> Since the July Board meeting, we have continued to sharpen our focus on our intended use of the proceeds from the Mosby and Matthew Bender dispositions as well as our continuing significant free cash flow.  It had

> not been our assumption that we would immediately turn
> around and use these resources as a war chest to
> finance a major acquisition program, and over the past
> several months we tested this presumption by examining
> in detail the prospect for value creation and the
> acceleration of earnings growth through acquisitions.
> * * *

All subsequent reports to the board, the shareholders, and the SEC represented that the cash proceeds of the divestiture of Bender were controlled by Times Mirror and were being used for Times Mirror's strategic repurchase of stock and new acquisitions. Although petitioner disputes the legal significance of these representations, it has never suggested that the representations were not entirely consistent with the terms of the documentation of the Bender transaction.

In 1999, Times Mirror, as manager of the LLC, effected a $21,160,000 cash dividend on MB Parent's common stock. Reed agreed to the amendments to MB Parent's corporate documents because Reed had unequivocally given up any interest in the $1.375 billion or in the earnings on that amount.

## Consideration for the Transfer of Bender to Reed

For purposes of section 368, the basic factual determination to be made is whether, under the contractual arrangements, the consideration received by TMD, the formal "divestor" of Bender, from MB Parent, the formal "divestee", was, as petitioner contends, common stock of MB Parent worth at least $1.1 billion or whether, as respondent contends, the consideration received

was title to the common stock plus effective control over $1.375 billion--the amount paid by Reed in the transaction. Certainly from the standpoint of Times Mirror, control of the funds was the most important asset received. From the standpoint of Reed, control of the Bender operations was the most important asset received. Neither TMD nor MB Parent had officers or employees. TMD had no operations independent of Times Mirror, and MB Parent had no operations independent of Reed. Unterman testified that Times Mirror was appointed manager of the LLC because TMD had no employees and was solely owned by Times Mirror. He further testified:

> Q [Counsel for petitioner] From your perspective as chief financial officer of Times Mirror, was Times Mirror's management authority over the assets of the LLC a separate part of the consideration Times Mirror received for Matthew Bender?
>
> A [Unterman] Not at all. It was all one deal.
>
> Q Could you explain your response, please?
>
> A Well, the economic asset was the cash that was in MB parent, and the LLC was a way of assuring that the cash would be invested in a manner that was parallel of Times Mirror's interests at all times.

Under the combined terms of the management agreement, MB Parent's restated certificate of incorporation, MergerSub's certificate of incorporation, the MB Parent stockholders agreement, and the MergerSub shareholders agreement, all incidents of ownership of the $1.375 billion were shifted to Times Mirror as of July 31, 1998.

Examination of the voting, dividend, redemption, and liquidation provisions of the documents, quoted at length in our findings, confirms respondent's view that only Times Mirror had a continuing economic interest in the cash, and only Reed had a continuing economic interest in Bender. The structure of MB Parent and the dividend provisions assured that any dividends paid to MB Parent from the operations of Bender would be paid to Reed as dividends on MB Parent's preferred stock. Moreover, when the structure was ultimately unwound, TMD would own MB Parent and the LLC and Reed would own Bender.

The foregoing factual analysis demonstrates that the consideration received by TMD, as the investment subsidiary of Times Mirror, was not common stock in MB Parent but was control over the cash deposited in the LLC. In relation to the arguments over expert testimony, as discussed below, petitioner asserts that the common stock and the management authority cannot be valued separately because it would have been unthinkable to transfer them separately. But this argument does not aid petitioner's case. Recognizing that no one would separately purchase either the common stock or the management authority confirms respondent's argument that common stock was not the only consideration for the transfer and that the common stock, viewed alone, did not have the value necessary for the transaction to

qualify under the reorganization provisions of the Internal
Revenue Code.

Valuation of MB Parent Common Stock

Petitioner argues that Times Mirror and Reed "conclusively"
agreed that the MB Parent common stock was worth $1.375 billion.
In the context of the entire agreement, however, the description
of the consideration in the merger agreement as common stock was
merely a recital consistent with the intended tax effect.  We
have examined the corporate governing documents to determine
whether the MB Parent common stock possessed the requisite value
for purposes of section 368(c).  Cf. Alumax Inc. v. Commissioner,
109 T.C. 133, 177-191 (1997), affd. 165 F.3d 822 (11th Cir.
1999).

The factual analysis of the transaction compels the
conclusion that the management authority over the cash in the LLC
had far more value to Times Mirror than the MB Parent common
stock and thus represented the bulk of the consideration.  For
completeness, we discuss briefly the expert testimony and the
context of petitioner's effective concession that the MB common
stock and the management authority over the LLC were inseparable,
which we conclude establishes that common stock was not the sole
consideration for the Bender transaction.

Petitioner's expert, Michael Bradley (Bradley), used a "net
asset value approach" to determine that MB Parent's common stock

was worth $1.375 billion.  Using an "avoided costs approach",
Bradley determined that the management authority might have a
fair market value ranging from $9.2 million to $44.1 million.
Bradley, however, gave no apparent consideration to the
contractual aspects of the Bender transaction and assumed--
contrary to any reasonable expectation or contractual
possibility--the immediate dissolution of MB Parent, Bender, and
the LLC as of July 31, 1998, the date of the transaction.
Bradley and petitioner's other experts, in rebuttal to
respondent's experts, asserted that, if separated from economic
ownership of the common stock of MB Parent, the management
authority had no value to a hypothetical purchaser.

Respondent presented three experts who had separately valued
the management authority and the MB Parent common stock.  Alan C.
Shapiro (Shapiro) provided an opinion of the fair market value of
the common stock immediately after the merger.  Like Bradley,
Shapiro began with a determination of net asset value.  Shapiro,
however, reviewed all of the contractual arrangements and
corporate governing documents and concluded that the MB Parent
common stock should be discounted substantially for lack of
control over the assets.  Using various assumptions, such as the
net value of MB Parent's assets after liabilities and the scope
of fiduciary responsibilities by the manager, Shapiro concluded
that the fair market value of the MB Parent common stock ranged

from a negative number, through worthless, to a maximum of $337 million.

Respondent also presented the testimony of William R. Zame (Zame), an economics and mathematics professor, who applied game theory principles to determine the value of the MB Parent common stock uncoupled from the management rights over the LLC. Zame acknowledged that his computed value was not the same as fair market value. He did, however, recognize that:

> [because] the common stock of MB Parent represents a derivative claim to the resources of Eagle I, by analyzing the nature of that derivative claim it is possible to determine the amount a rational, well-informed investor might be willing to pay for this claim, keeping in mind that there are other competing claims to the resources of Eagle I. It is value in this sense that this report estimates.

Zame applied probabilities to various assumptions and determined the most plausible estimates of the value of the MB Parent common stock as a fraction of the value of the LLC's assets. His analysis concluded that the "upper bounds of the stand-alone value" of the MB Parent common stock ranged from .595 to .800 of the value of the LLC.

Another of respondent's experts, Michael J. Barclay (Barclay), addressed the value of the management authority from a financial standpoint. Barclay also considered alternative assumptions about fiduciary duty and concluded that, without a fiduciary duty from the manager to the LLC, MB Parent, or the MB Parent common stockholder, the management authority would have a

value approaching $1.375 billion. Assuming a fiduciary duty,
Barclay opined that the management authority would have a value
of 40 percent of $1.375 billion.

Referring to Bradley's report, petitioner asserts:

Respondent's valuation approach caused his experts to
value rights that did not exist:  common stock in an
entity managed by an unrelated, hostile manager, and a
management authority giving unconstrained powers to an
unrelated, hostile manager.  Respondent's experts
assumed a hypothetical transaction with no resemblance
to the actual transaction or rights.  * * *

Petitioner claims that the management authority was an
uncompensated obligation, not an asset, assigned to Times Mirror
as the "residual claimholder" of the LLC's assets.

It is indeed unlikely that the authority of Times Mirror
under the management agreement would be separated from TMD's
ownership of the MB Parent common stock in the real world.
However, separation of the management authority from the putative
holder of the cash is part of the structure adopted by Times
Mirror so that it could maintain its position that the only
consideration received by TMD in the Bender transaction was the
MB Parent common stock.  Times Mirror and its advisers created
the scenario that makes it necessary to value the MB Parent
common stock at least as a portion of the total consideration.
To support its statutory argument, petitioner is asking us to
give effect to a fictional separation of the MB Parent common
stock transferred to TMD from the management authority

transferred to Times Mirror.  Additionally, petitioner's criticism of respondent's experts' valuation applies equally to petitioner's valuation, i.e., petitioner's experts ignore relevant facts concerning the property to be valued.

We do not need to reach any judgment about the fiduciary obligations that may or may not exist under Delaware law.  It is enough to observe that there is uncertainty on that subject, which uncertainty affects value.  See Estate of Newhouse v. Commissioner, 94 T.C. 193, 231-233 (1990).  We need not determine actual value of the MB Parent common stock, only proportionate value, i.e., whether the stock represents 80 percent of the total consideration paid by Reed.  It is possible to engage in interminable arguments about the reports of the various experts presented by the parties in this case.  To do so, however, would serve no useful purpose, because it would not affect the commonsense conclusions that (1) the MB Parent common stock cannot be isolated and treated as the sole consideration transferred to TMD for its divestiture of Bender and (2) the common stock of MB Parent, objectively, had a value less than $1.1 billion and less than 80 percent of the $1.375 billion paid by Reed.

Pertinent Precedents

Respondent invites us to adopt a broad-based approach and apply the "spirit" of the reorganization provisions in order to

deter the type of abuse that respondent perceives the Bender transaction to be.  We need not and do not accept respondent's invitation.  We are, however, mindful of the precedents and judicial homilies that support respondent's position.

The source of most "substance over form" arguments, of course, is Gregory v. Helvering, 293 U.S. 465 (1935).  In oft quoted language, the Supreme Court framed the issue as follows:

> The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.  But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.  * * *  [Id. at 469; citations omitted.]

Gregory involved a purported statutory reorganization and thus is particularly applicable here.  Petitioner argues, however, that "In the 70 years since Gregory was decided, no court has applied substance-form principles to override technical compliance supported by business purpose and true economic effect."  Indeed, in Gregory, the Supreme Court disregarded the form of a transaction as having no independent significance.  Before elaborating on the application of this principle and "true economic effect" in this case, we acknowledge the so-called progeny of Gregory.

Respondent cites Minn. Tea Co. v. Helvering, 302 U.S. 609, 613-614 (1938), in which the Supreme Court stated that "A given result at the end of a straight path is not made a different

result because reached by following a devious path. * * * The controlling principle will be found in Gregory v. Helvering".

Respondent also relies on another "reorganization" case, West Coast Mktg. Corp. v. Commissioner, 46 T.C. 32 (1966), in which the sole stockholder and president of the taxpayer corporation desired to dispose of certain land. In order to qualify the disposition as a tax-free reorganization under sections 354(a)(1) and 368(a)(1)(B), a corporation, Manatee, was formed, and the subject land was transferred to Manatee in exchange for stock. The stock of Manatee was then transferred to the acquiring corporation in exchange for its stock. Thereafter, Manatee was liquidated. Citing Minn. Tea Co. v. Helvering, supra, and Gregory v. Helvering, supra, this Court acknowledged that the transaction fell literally within the reorganization provisions but held that "the tax consequences must turn upon the substance of the transaction rather than the form in which it was cast." West Coast Mktg. Corp. v. Commissioner, supra at 40. Respondent argues that MB Parent in the instant case is comparable to the intermediary corporation in West Coast Mktg. Corp. in that it had no business, no offices, and no employees, and it served no purpose other than to create the form necessary to support a claim for tax-free reorganization treatment.

In addition to cases cited above, respondent relies on the legislative history of the reorganization provisions, various

legislative attempts to prevent abuse, and cases discussing continuity of proprietary interest as "the judicial bulwark and backstop for limiting deferral [nonrecognition] to the kinds of transactions that Congress intended should qualify."  See Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462 (1933); Cortland Specialty Co. v. Commissioner, 60 F.2d 937 (2d Cir. 1932).  Petitioner responds with the assertion that "Stock as consideration has always satisfied" the continuity of proprietary interest requirement "even when the stock conveys a highly attenuated economic interest in the acquiring corporation."  Here, however, petitioner is again assuming that stock was the sole consideration for the divestiture of Bender-- an assumption we reject under the facts of this case for the reasons discussed above.  Moreover, the interest of the MB Parent common stock held by TMD in the Bender operations is not merely "highly attenuated"; it is expressly negated by the evidence.

Petitioner does not address Minn. Tea Co. or West Coast Mktg. Corp.  Petitioner relies on Esmark, Inc. v. Commissioner, 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989), as demonstrating the limitations on applying substance over form analysis to recast a transaction that, on its face, complies with the formal requirements of a statute.  Respondent notes that Esmark, Inc. reaffirmed the notion that a

taxpayer's receipt of a substantial amount of cash for its property is the hallmark of a sale.  See id. at 187.

In J.E. Seagram Corp. v. Commissioner, 104 T.C. 75, 94 (1995), the taxpayer, arguing against reorganization treatment in an effort to establish a recognizable loss, relied on the rationale of Esmark, Inc., and this Court responded:

> Esmark Inc. involved a series of related transactions culminating in a tender offer and redemption of a part of the taxpayer's stock in exchange for certain property.  The Commissioner, seeking to apply the step transaction doctrine, sought to recharacterize the tender offer/redemption as a sale of assets followed by a self-tender.  While it is true that we held that each of the preliminary steps leading to the tender offer/redemption had an independent function, we also held that the form of the overall transaction coincided with its substance, and was to be respected.  In the case before us, petitioner would have us respect the independent significance of DuPont's tender offer, but disregard the overall transaction, which included the merger.  That result would, of course, be inconsistent as an analogy with the result in Esmark, Inc.  We therefore decline petitioner's request that we apply Esmark, Inc. to the facts of this case.  [Id. at 94.]

We believe that the J.E. Seagram Corp. analysis is helpful in this case.  In J.E. Seagram Corp. and in Esmark, Inc., we declined to give conclusive effect to a single part of a complex integrated transaction, as petitioner would have us do here.

Petitioner relies primarily on two aspects of the documentation to conclude that the Bender transaction qualifies as a tax-free reorganization.  The first is the form by which MB Parent common stock flowed to TMD and by which Bender preferred

stock flowed to MB Parent.  We agree with respondent that this case is more like West Coast Mktg. Corp. than like Esmark, Inc. There are differences, of course.  MB Parent was not intended to be, and has not been, liquidated as promptly as the intermediary in West Coast Mktg. Corp.  Additionally, MB Parent was putatively formed by the acquirer rather than by the party divesting itself of the property.  Given the terms of MB Parent's governing documents and the structure of its several classes of stock, however, it has no more function than the intermediary in West Coast Mktg. Corp.  By contrast to the facts in Esmark, Inc., here there is no uncontrolled participation by persons who are not parties to the contractual arrangement, such as the public shareholders in Esmark, Inc., to give substantive economic effect to the existence of MB Parent.  To disregard the existence of MB Parent is not to ignore any meaningful step in the transfer of Bender from Times Mirror to Reed.

Second, petitioner asserts that "the evidence conclusively establishes that the parties valued the MBP Common at $1.375 billion."  Petitioner argues that the agreement of the parties as to value was the result of arm's-length negotiations between Times Mirror and Reed.  The arm's-length negotiation, however, led to the parties' agreeing to adopt the form of tax-free reorganization, which required a recital that the common stock was the consideration being exchanged for the Bender stock.

That language was consistent with Times Mirror's tax objectives, which were accepted by Reed when Reed concluded that it could not acquire the Bender stock without agreeing to those terms. While terms negotiated between the parties may produce evidence of value, they are not conclusive. Cf. Berry Petroleum v. Commissioner, 104 T.C. 584, 615 (1995), affd. without published opinion on other issues 142 F.3d 442 (9th Cir. 1998). In the instant case, the negotiated terms are overcome by the evidence, as discussed above, that the MB Parent common stock did not have a value of $1.375 billion or even 80 percent of that amount.

Once petitioner acknowledges and asserts that the MB Parent common stock cannot be separated from the authority of Times Mirror, the "ultimate claimholder", to manage the cash in the LLC, the putative 20-percent voting power of the common stock in MB Parent and the bare title of MB Parent in the LLC should be disregarded. MB Parent clearly serves no purpose and performs no function apart from Times Mirror's attempt to secure the desired tax consequences. In this context, we agree with respondent's reliance on Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), observing that "the simple expedient of drawing up papers" is not controlling for tax purposes when "the objective economic realties are to the contrary."

As we indicated at the beginning of our factual analysis, our understanding of the Bender transaction gives full effect to

all of the contractual terms other than the labels assigned.  As
we indicated in our discussion of the dispute over valuation of
the common stock, we agree that it is unrealistic to separate the
common stock in MB Parent from the authority to manage
$1.375 billion in cash held by Times Mirror through the
management agreement.  Thus, we are simply looking at the
operative terms of the Bender transaction by analyzing the
respective rights of the parties to it as interpreted by them
before, on, and after July 31, 1998.

The evidence compels the conclusion that Times Mirror
intended a sale, assured that it would receive the proceeds of
sale for use in its strategic plans, used the proceeds of sale in
its strategic plans without limitation attributable to any
continuing rights of Reed, and represented to shareholders and to
the SEC that it had full rights to the proceeds of sale.  None of
these actions were inconsistent with the contractual terms.
Thus, we need not "substitute respondent's version" for "what
actually transpired."  We deal only with what actually transpired
and give effect to the legal documentation of the Bender
transaction, with key points emphasized by the terms of the
documents and the statements made by Times Mirror representatives
about what was accomplished in the Bender transaction.

In a different but analogous context, the Court of Appeals
for the Seventh Circuit has stated:

> The freedom to arrange one's affairs to minimize taxes
> does not include the right to engage in financial
> fantasies with the expectation that the Internal
> Revenue Service and the courts will play along.  The
> Commissioner and the courts are empowered, and in fact
> duty-bound, to look beyond the contrived forms of
> transactions to their economic substance and to apply
> the tax laws accordingly.  That is what we have done in
> this case and that is what taxpayers should expect in
> the future.  * * *  [Saviano v. Commissioner, 765 F.2d
> 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983).]

From any perspective, the "true economic effect" (petitioner's words, quoted above) of the Bender transaction was a sale.  Because the consideration paid by the buyer, to wit, unfettered control over $1.375 billion in cash, passed to the seller from the buyer, the Bender transaction does not qualify as a reorganization under section 368(a)(1)(B), which requires that the exchange be solely for stock.  Because the MB Parent common stock lacked control over any assets, its value was negligible in comparison to the $1.1 billion value that would be required to qualify the Bender transaction as a tax-free reorganization under section 368(a)(1)(A) and (a)(2)(E).

Evidentiary Matters

The extensive stipulations of the parties included certain documents to which objections were made with the understanding that the objections would be discussed in the posttrial briefs. Respondent objected on relevance, materiality, and hearsay grounds to four articles concerning the failed merger between Reed and Wolters Kluwer.  Petitioner did not address these

materials in the briefs, and we have not relied on them in our findings.  The relevance and hearsay objections will be sustained.

Petitioner objects to certain exhibits proposed by respondent, consisting of documents provided to respondent by petitioner or its representatives during the audit and during pretrial negotiations and preparation.  Petitioner objects to the materials on the grounds of relevance, relying on Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974).  As to one document authored by petitioner's counsel, petitioner also objects that it was provided in settlement negotiations.  See Fed. R. Evid. 408.  Although respondent disputes whether petitioner can rely on the rule of Greenberg's Express, Inc. v. Commissioner, supra, respondent does not show how the materials in question are helpful in our resolution of this case.  We have not relied on them in our findings of fact.  Petitioner's relevance objections are sustained.

Petitioner objected at trial and renews on brief an objection to the testimony of Brian Huchro (Huchro), a senior staff accountant in the Division of Enforcement at the SEC who testified on SEC reporting requirements of publicly held companies.  Huchro was identified in the trial memorandum and submitted a report as a rebuttal witness to Arthur C. Wyatt (Wyatt), whose report had been submitted by petitioner.  At the

time of trial, petitioner decided not to call Wyatt and then raised objection to Huchro's testimony.  We do not rely on Huchro's report in our findings of fact.  The representations made by Times Mirror in various SEC filings are recounted only to show that such representations were made, and we need not draw any conclusions about what was required by the SEC or the relationship of SEC rules to Generally Accepted Accounting Principles.

We have considered the arguments of the parties that were not specifically addressed in this Opinion.  Those arguments are irrelevant to our decision.  In view of our resolution of the primary issue, we do not address respondent's alternative argument under section 269.  To reflect the foregoing and to provide for resolution of the Mosby issues, neither tried nor addressed in this opinion,

<u>An appropriate order</u>

<u>will be issued</u>.